**Frances AHERN, Plaintiff,**

v.

**BOARD OF EDUCATION OF the SCHOOL DISTRICT OF GRAND ISLAND SCHOOL DISTRICT et al., Defendants.**

**Civ. No. 1618 L.**

United States District Court,
D. Nebraska.

April 20, 1971.

Wallace Rudolph, Lincoln, Neb., for plaintiff.

Flavel Wright, Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, District Judge.

The plaintiff was a non-tenured instructor at a public school and was discharged before expiration of her contract period. Seeking pecuniary damages and injunctive relief, she filed in this court a complaint framed within the Civil Rights Act, 42 U.S.C. §§ 1983 and 1985, naming as defendants the Board of Education, the individual board members, the superintendent of schools, the assistant superintendent of schools, who was also secretary of the board, and the principal of the high school. Trial has been concluded and extensive briefs have been submitted.

Issues raised by the complaint relate to deprivation of the plaintiff's rights of free speech, due process, and right to teach under the First, Fifth and Ninth Amendments to the Constitution of the United States.

## FINDINGS OF FACT

Frances Ahern was employed as a public schoolteacher by the School District of Grand Island, Nebraska, from September, 1966, until her discharge on March 31, 1969. The contract of employment for the year 1968–1969 was identical to the contract executed March 15, 1969, for the year 1969–1970,[1] except that Miss Ahern was to receive an increase in salary for the 1969–1970 term.

1. For purposes of this decision the relative portions of the contracts were:

"3. Said teacher hereby agrees to be governed by the rules and regulations of the Board of Education of said School District.

"4. Said teacher agrees to accept such assignment of grades or classes as may be determined upon by the Superintendent of Schools, with the approval of the Board of Education, and to teach said grades or classes in an efficient manner. It is further agreed that the right to transfer said teacher to another position during the school year is reserved by the Board of Education."

Published regulations of the school district included the following as Article V, at page 40:

"1. The acceptance of a position in the Grand Island public schools will be regarded as a contract and pledge to follow all the directions and regulations of the board, superintendent and principal. When any willful neglect of such rules shall be manifested by any teacher, it shall be considered sufficient cause for the superintendent to declare that teacher's position vacant, subject to the approval of the board.

\* \* \* \* \*

"4. *Teamwork* Teachers should, at all times, bear in mind the supreme importance of loyalty to the school and its constituted authorities. If there is just cause for criticism or complaint, the teacher may go directly to the principal or the superintendent, where the grievance will receive due consideration. Children profit when the entire staff works together in sympathy and hearty co-operation.

"Employees who feel that they have just grievances which cannot be settled through normal channels are encouraged to state their grievances in writing within ninety days of the time they feel the injustice has occurred. Such grievances may be presented to the superintendent directly or through a regular grievance committee. The board of education will consider grievances promptly and will give a decision in writing through the superintendent of schools."

In the summer of 1968 Miss Ahern attended the N.D.E.A. Civic Institute, titled "American Liberties and Social Change," at the Center for Research and Education in American Liberties, Teachers College, Columbia University. The institute challenged the efficacy of the traditional authoritarian teaching approach in teaching about American liberties. The institute sought to provide the participants with a new approach to teaching, the inquiry method, which shifted to the students many decisions previously made unilaterally by the teacher, including the specific subject for daily discussion, the course material to be used, and rules of in-class behavior.

During the second semester of the 1968–1969 school year Miss Ahern was assigned to teach two classes of Economics and two classes of Consumer Economics and she was responsible for a study hall. There is some dispute as to whether the course in Consumer Economics was more properly denominated by Miss Ahern Consumer Politics and as to what the content of the course was supposed to be. The course was designed to accommodate high school seniors who ranked in the lower 20 per cent of their class. It is clear that the content of the course was expanded by Miss Ahern from merely economic analysis to politics and social change.

Miss Ahern's increased sensitivity to student rights was manifested during her first semester course of Contemporary Government. Permission was requested and obtained from Dr. Eugene Miller, the principal, to use the school system as the government to be studied as a model. As a part of the Contemporary Government course, Miss Ahern's students under her guidance developed a statement of "student rights and responsibilities."

The first sign that the school administrators seriously questioned Miss Ahern's teaching method was on February 14, 1969, at a meeting with the principal and assistant principal. However, it was the week of March 10, 1969, and the ensuing events which culminated in the decision by the principal on March 21, 1969, to suspend Miss Ahern and the decision by the school board on March 31, 1969, to terminate her contracts.

During the week of March 10 Miss Ahern with the permission of the high school authorities attended a special seminar in Atlantic City, New Jersey. A substitute teacher was assigned to conduct Miss Ahern's classes. On March 17 Miss Ahern returned from the seminar and at the second and third period classes, which were both Consumer Economics or Consumer Politics classes, the students related to Miss Ahern that the substitute teacher had not permitted them to discuss in small groups, required them to sit in straight rows, changed the study plans, told them that the classroom was no longer a playroom, gave one student a low grade because she could not read his writing, and conducted the classes generally in a manner not in keeping with Miss Ahern's usual method. The students, at least in the third period Consumer Politics class, said that by the end of the substitute teacher's week of teaching the students were antagonistic and refused to give the substitute their names and that at the third period Consumer Politics class on Friday, March 14, the substitute had seized a boy by the hair and had slapped him three times across the face, knocking off his glasses, whereupon the boy left the room. On hearing this report Miss Ahern in the classroom said with reference to the substitute teacher, "That bitch," because she was terribly angry, and also said, "I hope that if this happens again * * * all of you will walk out."

At the sixth period Economics class, consisting of students not present at the slapping incident, on Monday, March 17, Miss Ahern had the slapping incident role-played and discussed. Using the incident as a current issue to which the students could relate in the experiencing of involvement in the study of democratic processes, Miss Ahern encouraged the focusing of all her classes' attention on the matter of devising a proposal for a

school regulation regarding corporal punishment. She assisted her students in drafting a resolution, which stated:

"We think teachers should have authority.

"But the student has a right as a person not to be threatened with or to be subjected to physical coercion. The student has a right as a person to be free from verbal abuse intended to humiliate him, to cut him down.

"Teachers have the right as persons not to be threatened with or to be subjected to physical coercion. They have the right to be free from verbal abuse intended to humiliate them."

The plan developed by Miss Ahern and her students was to present the statement to the high school student council which was scheduled to meet on Wednesday, March 19. A prior commitment by the council caused its Wednesday meeting to be cancelled and no further attempt was made by Miss Ahern or her students to submit the statement to the council before her suspension. On March 19 Miss Ahern was called to Dr. Miller's office for a meeting, which was attended by Dr. Miller; the assistant principal, James Shehein; the department chairman, Jack Richards; and Miss Ahern. At the meeting Dr. Miller, among other things, upbraided her for calling a substitute teacher a "bitch" in front of her class, read to her portions of her teaching contract[2], advised her not to sign a contract for the next year because her philosophy did not "fit in this school," told her to change her philosophy or he would see that she was removed from the classroom, told her that disciplinary action on a substitute or regular teacher was an administration function and not that of a teacher or students; told her that her main function was to teach economics during class time and not the discussing of teachers,

and directed her to return to her class, to teach as she had during the first two years, not to discuss with any of her classes the slapping incident or any teacher, and to get her classes and her study hall under control by March 24 or she would be relieved of her classroom duties for the balance of the year.

The principal's admonitions were deliberately ignored by the plaintiff because she thought that adhering to them would have threatened her rapport with her students and because she believed that the principal could not dictate to her the philosophy or method of teaching to be used in the classroom. The day following, which was Thursday, March 20, at least one entire class session—the sixth period class in Economics—was consumed in a discussion of the slapping incident, the proposed resolution or statement, the refusal of Dr. Miller to meet with the students, and the advisability of the students' gathering in a substantial number at 8:10 the next morning before the 8:15 classes.[3] Lee Perkins, an assistant principal, attended the class session and thereafter reported to Dr. Miller that Miss Ahern's class was discussing the subjects noted above and was not discussing economics. Although Miss Ahern's classes in Consumer Politics or Consumer Economics had previously taken the posture, with the knowledge of Jack Richards, the head of the department, of a course of study of democratic methods of problem-solving, the Economics classes were framed by Miss Ahern and approved by the administration as a course in "the development, operation, and problems of a market economy. * * * Economics is concerned with the way societies go about allocating scarce resources among competing wants."[4]

Also on March 20 Miss Ahern sent from her third period Consumer Politics

---

2. The portions read were those set out in footnote 1, not including the quotations from the published regulations of the school district.

3. Exhibit 26 is a transcript of the taped session of that class.

4. "Senior High School Course Outlines for Social Studies," Exhibit 27, "A" ECONOMICS.

class a copy of the resolution prepared by her and her students and a note stating:

> "Dr. Miller, Third Period Consumer Politics class would like to discuss with you the subject raised in this statement today in class. Frances Ahern." [5]

Dr. Miller ignored the request. Miss Ahern then invited the principal by calling him from the classroom on the classroom telephone to speak to the class about the resolution on corporal punishment. Dr. Miller through his secretary again declined to meet with Miss Ahern and her students in the classroom, but offered to meet with students at his office.

On Friday morning, March 21, at 8:00 o'clock, Miss Ahern appeared by request at the principal's office and was told by Dr. Miller:

> "Miss Ahern, I have some statements to make. I ask you to listen and then you will be given an opportunity to speak. Since our meeting on Wednesday morning, you have failed to return to your classes and teach economics as directed. Instead, you have continued to discuss with students, students' rights and teachers' rights and non-rights of the students, and in addition have aided students in preparing slips of papers advocating a protest movement in the Senior Lounge this morning. For these reasons and the reasons that we gave you Wednesday morning, I am suspending you from all teaching duties here at Senior High, effective immediately, until at which time you will be given an opportunity for a hearing before the Board of Education.

> \*    \*    \*    \*    \*    \*

> "Yes, your suspension will be with pay, your status will be determined at the Board of Education hearing."

Her reply was:

> "I don't know what I should do. I question the second statement because the statement drafted by the students

in my class expressed their feelings, and mine, too, but I did not push them and I was very careful to make sure that they felt strongly about this and that they wanted to make this kind of statement. The statement is very moderate and the purpose of having it drafted and submitted to the Student Council first is that it is the proper way to effect change. The Council refused to consider it or they were not permitted to consider it. The second step, as far as they were concerned, was to ask you to come down to talk about it. You were asked once on the phone and once by letter. You did not come. The only purpose in this meeting, and you could stop it so easily, is to go out simply and sit down and talk about the statement or arrange for a time when you can talk about the statement. That's the only purpose of this. I feel that they want to make this statement, they want you to consider it with them and that is all. The meeting will disappear." [6]

The pre-class meeting of the students was orderly and involved 150 to 200 students. They were asked to disperse and to meet their 8:15 classes and were told that, if they have grievances, spokesmen should be selected and a meeting would be scheduled at the end of the day. The first bell for convening classes sounded at 8:10; the tardy bell sounded at 8:15. Twenty or twenty-five students remained long enough to be ten or fifteen minutes late to class. At the end of the day a meeting was held between seventeen or eighteen students and three administrators for forty-five minutes.

On March 25 the superintendent, Dr. Lundstrom, informed Miss Ahern by telephone that the school board would conduct a hearing into the matter of her suspension on March 27, 1969. There is no indication that she made any objection to the time of the hearing or requested any postponement. The hearing was held on March 27 and was attended by members of the board, Miss

---

5. Exhibit 8.

6. Exhibit 23.

Ahern, Dr. Miller, and Miss Ahern's attorney. The meeting lasted approximately three hours and a transcript of the proceedings covers 66 double-spaced elite typewritten pages.[7] Miss Ahern testified at length at the hearing, under questioning by her counsel and by various board members, as to her philosophy of education, her characterization of the substitute teacher as a "bitch," the student petition drive to establish rules for discipline within the school, and the plans for the Friday morning pre-class meeting of students. Dr. Miller testified regarding the striking of the student, Miss Ahern's discussing that subject with her classes, his directing her to teach economics, her manner of maintaining or failing to maintain discipline in her classes and study hall, his philosophy of education, and his role in the suspension of Miss Ahern. Dr. Miller was cross-examined by Miss Ahern's counsel.

On March 31 the board of education held a final meeting, attended by Miss Ahern's counsel, into the Ahern[8] matter. The superintendent, Dr. Lundstrom, recommended that Miss Ahern's position be declared vacant by reason of a willful neglect of Article V of the policies and regulations of the school district.[9] By unanimous vote the position was declared vacant and Miss Ahern's contract for the 1968–1969 year was terminated as of March 31, 1969, and the 1969–1970 contract was declared void.

Miss Ahern's suspension, the declaration of the vacancy, the termination of her 1968–1969 contract, and the voiding of the 1969–1970 contract were solely for insubordination in the willful violation of Dr. Miller's directions to Miss Ahern related to her at the meeting of March 19, 1969, as specified in Dr. Miller's statement of March 21, 1969.

### DUE PROCESS OF LAW

■ Persons, including teachers, who are employed by a state are entitled, be-

cause of the relationship with the state, to be free from discharge during the course of a contract of employment within the confines of due process of law. Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956). Due process is a flexible concept, but means, at least, that there must be (1) a rational connection between the reason for the discharge and a rightful interest of the state, (2) a basis in fact for the reason for the discharge, Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952) and Slochower v. Board of Education, supra, and (3) a reason for discharge other than the exercise by the employee of a constitutional right, Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). These elements, for convenience, may be referred to as substantive due process.

■ I have no difficulty in concluding that substantive due process was accorded the plaintiff. The discharge was bottomed, by the clear import of the evidence, upon insubordination arising from directives stemming from Miss Ahern's criticism in class of a fellow teacher who slapped a student and steps taken by Miss Ahern during classroom hours in seeking consideration of a declaration of student rights. The rightful interest of the state was that of maintaining harmony among members of the faculty, the students, and the administrators, as well as an interest in ascertaining that economics be taught in a course in economics. A rational, as well as factual, connection between the reason for discharge and a legitimate interest of the state is beyond question.

A basis in fact existed for the reason for discharge. Miss Ahern admittedly violated deliberately the principal's order to stop discussing in the classroom the slapping incident and the proposal for student rights, as well as his directive to teach economics. Her acts in these

---

7. Exhibit 24.

8. Exhibit 42 is a transcript of the meeting.

9. The specific provision is paragraph 1 of Article V, quoted in footnote 1.

respects may have been honest and even laudable, but there remains no doubt of the factual basis for a finding of insubordination.

■ I am persuaded that the exercising of a constitutional right was not the reason for the discharge. Although a teacher has a right to express opinions and concerns, as does any other citizen, on matters of public concern, by virtue of the First and Fourteenth Amendments, Pickering v. Board of Education, supra, I doubt that she has a right to express them *during class* in deliberate violation of a superior's admonition not to do so, when the subject of her opinions and concerns is directly related to student and teacher discipline. *Pickering* distinguishes the situation in the present case, as follows:

"* * * (I)t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performed through its employees.

"* * * The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. Thus no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here. Appellant's employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning. * *. * "

Miss Ahern, on the other hand, chose a subject for discussion and action which did involve "maintaining either discipline by immediate superiors or harmony among coworkers" and employment relations which were "the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning." The same observations are relevant to any claim that Miss Ahern's right to teach, to the extent that the Ninth Amendment protects such a right, was denied. Additionally, I doubt that she had a constitutional right to teach politics in a course in economics. The sixth period class—the one reported to Dr. Miller by Mr. Perkins as including no teaching of economics on March 20 and which clearly precipitated the suspension—was a class designed by Miss Ahern and approved by the administrators as a course in economics, which in no sense included by definition a study of methods of developing student rights or teacher rights on corporal punishment. With respect to whether the reason for discharge was that Miss Ahern was exercising a constitutional right it must also be noted that what ordinarily would be a right protected by the constitution may not be so protected if the exercise of that right constitutes a direct violation of an order by a superior on a subject rationally connected with a legitimate interest of the state-employer. Thus in Nelson v. Los Angeles County, 362 U.S. 1, 80 S.Ct. 527, 4 L.Ed.2d 494 (1960) the refusal of an employee to answer questions on Fifth Amendment grounds in violation of an order of the state-employer to testify was held to be a constitutionally permitted reason for the employee's discharge, where the subject of the questions which the employee refused to answer related to whether the employee was a security risk, a legitimate subject for inquiry by the employer. Insubordination, therefore, becomes a proper ground for discharge, even when it becomes enmeshed with the reliance upon constitutional rights. This is not to say that disagreement cannot be expressed with views of the administration, but it does

mean that when reasonable alternatives for expression of dissent are available, as they were in the present case, a teacher is not constitutionally entitled to use the classroom as a forum for expression of disagreement with her administrators on internal affairs.

■ The matter of what may be called, for convenience, procedural due process—the right to a hearing and its concomitants—is more troublesome. The great majority of recently reported civil rights cases by public schoolteachers have involved non-renewal of the teaching contract, rather than discharge during the existing contract. See Freeman v. Gould Special School District of Lincoln County, Ark., 405 F.2d 1153 (C.A. 8th Cir. 1969); Harkless v. Sweeny Independent School District, 427 F.2d 319 (C.A. 5th Cir. 1970); Orr v. Trinter, 318 F.Supp. 1041 (U.S.D.C.S.D.Ohio 1970); Worthington v. Joint School District No. 16, 316 F.Supp. 808, 809 (U.S.D.C.E.D. Wis. 1970); Knarr v. Board of School Trustees of Griffith, Indiana, 317 F. Supp. 832 (U.S.D.C.N.D. Ind. 1970); Jones v. Hopper, 410 F.2d 1323 (C.A. 10th Cir. 1969); Thaw v. Board of Public Instruction of Dade Co., Fla., 432 F.2d 98 (C.A. 5th Cir. 1970); Schultz v. Palmberg, 317 F.Supp. 659 (U.S.D.C. Wyo. 1970); Roth v. Board of Regents of State Colleges, 310 F.Supp. 972 (U.S. D.C.W.D. Wis. 1970); Gouge v. Joint School District No. 1, 310 F.Supp. 984 (U.S.D.C.W.D. Wis. 1970); Lucas v. Chapman, 430 F.2d 945 (C.A. 5th Cir. 1970); Drown v. Portsmouth School District, 435 F.2d 1182 (C.A. 1st Cir. 1970). The Supreme Court of the United States has not declared that the steps of procedural due process are applicable to the termination of rights arising solely from contract. It reasonably may be argued that Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), establishes a standard which will be applicable to schoolteachers' contractual relationships. The plaintiff there was a welfare recipient who summarily had been removed from the welfare rolls without a hearing. No conten-

tion was made on behalf of the governmental officials that the plaintiff was not entitled to a hearing after the termination and the issue was whether she was entitled to a pre-termination hearing. In holding that a pre-termination hearing was required by procedural due process the court balanced the interests of the state against the interests of the welfare recipient whose very livelihood depended upon the welfare fund. Such statutory rights in the recipient, when weighed with the monetary interests of the state, demanded the granting of a hearing prior to the termination. It may be said that contractual rights of a schoolteacher should be granted similar consideration, at least to the extent of the insistence upon a hearing at some time. On the other hand, it must be recognized that the interests of a schoolteacher in retaining a specific position of employment weigh less heavily than the interests of a person who in all probability cannot otherwise than by welfare obtain the essentials of existence. The court in *Goldberg* recognized the substantial interests of a welfare recipient by saying:

"* * * For qualified recipients, welfare provides the means to obtain essential food, clothing, housing, and medical care. * * * Thus the crucial factor in this context—a factor not present in the case of a blacklisted government contractor, the discharged government employee, the taxpayer denied a tax exemption, or virtually anyone else whose governmental entitlements are ended—is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits. * *"

The interest of the state in *Goldberg* was monetary only and commanded less consideration than the interest of the state in maintaining an orderly and harmonious educational faculty in a public high school.

A similar balancing was used in Cafeteria and Restaurant Workers Union Local 473, A.F.L.–C.I.O. v. Mc-

Elroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), wherein it was held that a cook could be discharged without being accorded a hearing or being informed of the specific grounds for her exclusion. The interest of the government was substantial—"to manage the internal operation of an important federal military establishment," 367 U.S. at 896, 81 S.Ct. at 1749, and the interest of the cook was lighter by comparison—"the opportunity to work at one isolated and specific military installation," 367 U.S. at 896, 81 S.Ct. at 1749. It is not unreasonable to suggest that in the present case Miss Ahern was denied only the opportunity to work at one isolated and specific high school, as contrasted with denial of opportunity to be employed in any teaching institution, such as would be involved by denial of a lawyer's right to practice law, as in Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957) or perhaps the denial to a teacher of a teaching certificate.

The present case does not materially differ from *Cafeteria Workers* insofar as the reason for discharge is concerned. In the *Cafeteria Workers* case the court said:

"We may assume that Rachel Brawner could not constitutionally have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory—that she could not have been kept out because she was a Democrat or a Methodist. It does not follow, however, that she was entitled

to notice and a hearing when the reason advanced for her exclusion was, as here [failure to meet security requirements] entirely rational and in accordance with the contract with M & M." 367 U.S. at 898, 81 S.Ct. at 1750.

Similarly, in the present case the announced reason, insubordination, was entirely rational and in accordance with the contract between the school district and the teacher.

Nevertheless, the interest of a schoolteacher in specific employment may be of greater weight than a similar interest of a cook and the interest of the government in security on a military base may be more urgent than a state's interest in maintaining an orderly and harmonious faculty in a public high school.

I confess that the uncertainties which remain from a comparative analysis of *Cafeteria Workers* and *Goldberg* leave no clear answer for the present case. Were it not for Freeman v. Gould Special School District of Lincoln County, Ark., 405 F.2d 1153 (C.A. 8th Cir. 1969), my inclination would be to hold that the plaintiff was entitled to procedural due process, including at least the elements of a notice of the reasons advanced for proposed discharge, a hearing at which the factual bases for those reasons could be refuted, if she were able to refute them, and a right to cross-examine the person or persons primarily aware of the charges being leveled.[10] However, until the Supreme Court of the United States [11] or the Court of Appeals for

10. I do not reach the question of whether these elements were present in the proceedings by the board.

11. Guidance in this regard ultimately may come from cases presently pending in the Supreme Court of the United States. In DeCanio v. School Comm. of Boston, 260 N.E.2d 676 (1970) the Supreme Judicial Court of Massachusetts held that the summary dismissal of six public school teachers who were non-tenured did not deprive the plaintiffs of due process. The dismissal was based on

constitutionally permissible grounds, conduct unbecoming teachers, but it could be argued that the teachers' participation in a demonstration which resulted in their dismissal was protected activity under the First Amendment. The case is now in the Supreme Court as Fenton v. Boston School Committee, 401 U.S. 929, 91 S.Ct. 925, 28 L.Ed.2d 209. Also, in Perry v. Sindermann, No. 952, 39 U.S. L.W. 3303, certiorari was filed on November 9, 1970, from a Fifth Circuit ruling, the question being presented as "Does teacher without tenure and with

this circuit makes a declaration that the principles of *Goldberg*, rather than those of *Cafeteria Workers*, are applicable to the discharge of a public schoolteacher for the reason of insubordination, I must respect the declaration of the Court of Appeals for the Eighth Circuit in *Freeman:*

> "Absent statutory or contractual requirements, persons discharged for inefficiency, incompetency, or insubordination have no constitutional right to a hearing with rights of cross-examination and confrontation of witnesses."

In the present case there is no contractual requirement for a hearing. A statutory right to a hearing before the board of education exists upon the filing of a written request by the teacher whose contract is terminated,[12] but no such request was made by Miss Ahern.

Accordingly, judgment will be entered for the defendants and costs will be taxed to the plaintiff.

no expectancy of having his contract renewed have any constitutionally protected right to continued employment?"

12. Section 79–1254 Nebraska R.R.S.1943.