**William FIELDER, a minor, by his mother and next friend, Lois Kramer, Thomas DeCora, a minor, by his mother and next friend, Anna Q. Sun, on their behalf and on behalf of all persons similarly situated, Plaintiffs,**

v.

**BOARD OF EDUCATION OF the SCHOOL DISTRICT OF WINNEBAGO IN the COUNTY OF THURSTON IN the STATE OF NEBRASKA, whose members are: Emmett McGhee, et al., Defendants.**

No. CV72-L-134.

United States District Court,
D. Nebraska.

March 31, 1972.

der the Civil Rights Act, 42 U.S.C.A. § 1983. A temporary restraining order was entered by this court on March 7, 1972, directing reinstatement and setting a hearing on a motion for a preliminary injunction for March 15, 1972. A hearing on that motion was held as scheduled, after which a temporary injunction was entered. This memorandum expresses the basis of the temporary injunction.[1]

## FINDINGS OF FACT

The 1971–1972 academic year opened on August 25, 1971. William Fielder, a senior, enrolled in mid-October. Thomas DeCora, a sophomore, enrolled in late September. They apparently filled out their class schedule forms with the assistance of counselors and were assigned to a particular room for each class. School was then and now is in session from 8:45 a. m. to 3:30 p. m.

On October 28, the principal, A. A. Khan, gave to each student and mailed to

Charles F. Wilkinson, San Francisco, Cal., and Daniel J. Taaffe, Boulder, Colo., for plaintiffs.

Theodore L. Kessner, Lincoln, Neb., for defendants.

URBOM, Chief Judge.

Two students, who were expelled from a state-supported public high school on February 7, 1972, for the remainder of the school year, have sued for relief un-

[1]. The temporary injunction states:
"IT HEREBY IS ORDERED:
"1. That the defendants Board of Education of the School District of Winnebago in the County of Thurston in the State of Nebraska, whose members are Emmett McGhee, President, Norman C. Free, George S. Olson, Rodney Krause, Trino Gomez, and Neal Nelson; W. C. Womersley, as Superintendent; and Asad Ali Kahn, as Principal, shall continue the reinstatement of William Fielder and Thomas DeCora as students in good standing in the Winnebago public school, school district number 17, Thurston County, Nebraska, until further order of the court after a trial on the merits or, if earlier than such further order, completion of a hearing before the school board of the School District of Winnebago in the County of Thurston in the State of Nebraska on any charges the defendants choose to make against such students—William Fielder or Thomas DeCora or both of them—which hearing shall include or be accompanied by:
a. The furnishing to each such student or his parent or legal guardian of a written statement of the reasons advanced for possible disciplinary action at least three days before the hearing;
b. Written notice to each such student or his parent or legal guardian of the

date of the hearing at least three days before the hearing;
c. Permission for each such student and his parents or legal guardian to appear with counsel;
d. Opportunity for each such student and his counsel, if any, to examine any document submitted in support of the charges, and to hear and cross-examine the person or persons primarily aware of the facts out of which the charges emerge and any person orally presenting any evidence in support of the charges;
e. Opportunity for each such student with assistance of his counsel, if any, to present the student's version or refutation of the bases of the charges through documents and witnesses;
f. Delivery to the student or his counsel of a written statement that the board finds that the student is or is not guilty of the charges and, if the finding is that the student is guilty of the charges:
(1) the facts forming the basis of the finding of guilt determined solely from the presentations at the hearing, and
(2) the disciplinary action taken;
g. Such verbatim record of the hearing as such student may elect to have at his own expense or the school board may elect to have at its own expense."

the parents of each student a statement of rules [2] to be effective from November 1, providing for sanctions for unexcused tardiness, unexcused absence, skipping school, and skipping detention ("detention" is detention after school for specified periods of time). A follow-up statement was similarly distributed on November 17, 1971.[3]

Before his expulsion on February 7, 1972, William Fielder was twice suspended for periods of three days each and once for an indefinite period, the actual duration of which is not shown by the record. During the indefinite suspension, readmission was conditioned upon his parent's or parents' coming in to confer with school authorities. The indefinite suspension evidently resulted from his failure to go to class upon direction of the superintendent to do so at the conclusion of a student demonstra-

2. The October 28, 1971, statement of rules reads as follows:
"Dear Parent/Guardian;
"Since all of us as parents and teachers are deeply interested in the best learning opportunities for the boys and girls, it is very important that absenteeism and tardiness be cut down to its minimum. Quite a few of our boys and girls are, sometimes, unable to get the most out of the learning activities of their classrooms because of this unnecessary delay in reaching there. They are allowed sufficient time for change of classes but tardiness does not seem to be affected.
"The following rules will be followed with effect from Monday, November 1, 1971 to help our students develop the habit of regularity and punctuality and to eliminate unnecessary absenteeism, tardiness and skipping of school:
1. Each unexcused tardiness will mean one-half hour of detention after school time the same day.
2. More than one tardiness will mean that the student will stay for detention for the same number of half-hour periods. (i. e. three tardies in a day will mean one and a half hour of detention)
3. The student required to stay for detention will not be able to take part in games, sports or any other activity before finishing detention.
4. Unexcused absence will mean a *detention of two hours* on the day of attendance in school.
5. A note from a parent/guardian will be considered a valid excuse.
6. Skipping of school will mean detention for twice the time skipped or two hours, whichever is more.
7. Unexcused and intentional skipping of detention any day will mean doubling the time of detention next day.
8. Persistent skipping will be punished by suspension from school. The student will have detention for the time missed for the suspension on his/her return to school. Parents will have to accompany the student to the office on the student's return to school after suspension.
9. Repeated skipping of school, detention for absenteeism or tardiness will necessitate the student and parents explain to the School Board of Winnebago Public School District #17.
10. Students riding the school buses will have to arrange their return transportation from school with their parents themselves if they are detained for absenteeism and tardiness.
"This letter has the approval of the Student Council also. Your cooperation is very sincerely requested so we can serve you better and succeed in improving the learning of our younger people."

3. The follow-up statement dated November 17, 1971, reads as follows:
"Dear Parent/Guardian:
"In the best interest of our students it is very essential that they reach their classes in time, stay there for the duration of the classes, and pay due attention to the teaching/learning activities. For a valid reason the tardiness is excused. However, when tardiness, etc. are not excused, the following rules will be observed.
"Any student who is late/tardy to a class without a valid reason will have to stay for one half hour of detention for each tardy after school the same day.
"Any willful skipping of detention will be punishable by three days suspension from school. Upon return to school the detention will still have to be made up. It will also be necessary for the parent/guardian to come to school with the child.
"For a willful skipping of detention for the second time, the student will be expected to appear before the School Board, accompanied by the parent, at their next regularly scheduled meeting.
"We hope that your cooperation will help us to do a better job of educating the young people."

tion on November 12, 1971. On that occasion, a number of other students were temporarily suspended in addition to Fielder. The two three-day suspensions were ·in December and January and were imposed as a sanction for walking out of detention, skipping classes, skipping school, and using foul language.

On November 15, 1971, Thomas DeCora was suspended indefinitely; the actual duration of the suspension was not shown by the evidence. As with Fielder, DeCora's readmission was conditioned upon his parent's or parents' conferring with school authorities. The indefinite suspension was the result of the November 12 demonstration which led to the suspension of Fielder and others. DeCora was again suspended on January 28, 1972, for a period of three days for walking out of a class without the instructor's permission.

At a regular meeting of the school board on February 7, 1972, Fielder, DeCora, and three others were expelled for the balance of the school year. Fielder's parents were notified by letter of the expulsion. The reason for the expulsion, as stated in the letter, was "for his unwillingness to follow school rules and regulations, for skipping school and classes, for his unscholarly conduct and poor attitude toward learning." The content of the letter sent to DeCora's parents was the same. It is not shown whether the other expelled students received the same or similar letters.

There was no prior notice to the students or their parents of the board meeting of February 7, although William Fielder's mother apparently knew through a telephone conversation with the superintendent earlier in the day of February 7 that a school board meeting would be held and that the superintendent would present evidence regarding her son, but that he doubted that the board would expel her son and probably would only warn him. None of the students or parents attended the February 7 board meeting. The superintendent did present to the board summaries of reports by teachers on William Fielder and Thomas DeCora. The reports were prepared at the superintendent's request prior to the meeting.[4]

Action to expel all five students followed and the parents were notified of the expulsions by letters dated February 8. By letters dated February 15 the parents of William Fielder and Thomas DeCora were informed that they had a right to appear at the next regular meeting of the school board, scheduled for March 6. At some date before March 6, probably March 3, school administrators met with the attorneys for the plaintiffs and at the regular board meeting of March 6 William Fielder, his mother, and his counsel appeared, but neither Thomas DeCora nor his parents were at the meeting. At the suggestion of the plaintiffs' counsel the board went into executive session regarding William Fielder, during which time Fielder, his mother, the plaintiffs' two counsel, the superintendent and the principal were present, but not the teachers who prepared the reports which had been summarized by the superintendent for the February meeting. The reasons for the expulsion were stated by the administrators and were discussed by all. The summaries of the teachers' reports were made available to counsel, to William Fielder, and to his mother. No refutation of the charges or the asserted facts underlying them was offered by or on behalf of William Fielder, although suggestion was made that the board had acted too harshly and that the administration was not imposing discipline properly at the school. The board then apparently concluded that the expulsions should stand but took no action to reaffirm the expulsions.

4. These summaries, received in evidence by this court only to show what was before the board, are replete with indications by teachers of poor attendance, poor grades, and lack of interest in classwork. In view of the necessity of a future hearing before the board or a trial on the merits in this court, the details are not set out in this memorandum.

At the meeting of March 6 the board also met in executive session with Luther Whitewater and his parents. Whitewater was one of the other students who had been expelled at the February 7 meeting. The board acted to reinstate Whitewater, "provided his conduct is improved."

## CLASS ACTION ISSUE

The plaintiffs have brought the action on their own behalf "and on behalf of all persons similarly situated." Without specifically defining the parameters of the class sought to be represented, the plaintiffs have alleged, in general terms, that all elements prerequisite to the bringing of a class action are present in this case.

Rule 23 of the Federal Rules of Civil Procedure permits one or more members of a class to sue as representative parties on behalf of all the members under specified circumstances. Prerequisite to any class action are the requirements that:

1. The class must be so numerous that joinder of all members is impracticable;

2. There must be questions of law or fact common to the class;

3. The claims of the representatives must be typical of the claims of the class; and

4. The representatives must be in a position to protect fairly and adequately the interests of the class.

■ The complaint does not define the purported class. This in itself may be a sufficient infirmity to cause rejection of the request for a class action. However, there are other deficiencies. If the purported class consists of all students who were expelled on February 7, 1972, or have been expelled during the academic year, the number of the class is five. Clearly this is not a group so numerous that joinder of all members is impracticable. If the purported class is to be all students in the Winnebago public school, the only basis under the present showing which could be considered as constituting common

"questions of law or fact" is that supporting the allegation that the rules of conduct of the school are so vague and overly broad as to be void. Under the holding of the United States Court of Appeals for the Eighth Circuit in the case of Esteban v. Central Missouri State College, 415 F.2d 1077 (1969), authored by Judge (now Justice) Blackmun and by which I am bound, I have no doubt that the rules are not unconstitutionally vague, even though applicable to high school students, rather than college students. To the extent that the rules also apply to primary and junior high school students, there is no indication that the named plaintiffs' claims are typical of the claims of such primary and junior high school students or that the named plaintiffs are in a position fairly and adequately to represent such other students' interests.

The plaintiffs have alleged that other acts of the defendants are constitutionally impermissible and are applicable to all students—that is, lengthy suspensions without a hearing, suspensions which remain effective until the students' parents confer with administrators, a lack of specific mention in the rules of the penalty of expulsion, and the signing by students of a form which purports to be an agreement to abide by the regulations of the administration. Apparently, the plaintiffs seek to show that all other students in the Winnebago public school system are under threat of expulsion or suspension by the same constitutionally infirm methods employed against the plaintiffs Fielder and DeCora. The evidence does not support the assertion. Even if such threat were shown to exist as to other students, none of the named plaintiffs represent or have claims typical of any group other than those students who have been expelled from the Winnebago public school system. Such a group consists of only five students, certainly not a number too large to join all with practicability.

I conclude that this action does not constitute a class action under Rule 23, and the following portions of this memorandum and the order entered on March

16, 1972, are limited in application to the plaintiffs Fielder and DeCora.

## VAGUENESS ISSUE

■ The plaintiffs have challenged the regulation under which they were expelled on the basis that the regulation is too vague. As noted earlier in the discussion of the class action issue, I have concluded that the regulation is not too vague. Judge Hunter in Esteban v. Central Missouri State College, 290 F.Supp. 622 (U.S.D.C.W.D.Mo.1968), considered the vagueness question in connection with college regulations under which a student, Esteban, was suspended. It is appropriate to quote extensively from Judge Hunter's opinion:

"An institution may establish appropriate standards of conduct (scholastic and behavioral) in any form and manner reasonably calculated to give adequate notice of the scholastic attainments and behavior expected of the student.

"The notice of the scholastic and behavioral standards to the students may be written or oral, or partly written and partly oral, but preferably written. The standards may be positive or negative in form.

"Standards so established may apply to student behavior on and off the campus when relevant to any lawful mission, process, or function of the institution. By such standards of student conduct the institution may prohibit any action or omission which impairs, interferes with, or obstructs the missions, processes and functions of the institution.

"Standards so established may require scholastic attainments higher than the average of the population and may require superior ethical and moral behavior. In establishing standards of behavior, the institution is not limited to the standards or the forms of criminal law.

"If the student knows or as a reasonable person should know that the action or conduct he is about to undertake is violative of the regulation or standard of conduct and he intentionally engages in such conduct, he is in no position to invoke the aid of judicial equity powers involving equitable doctrines to enjoin resultant disciplinary action. In the instant case both Esteban and Roberds were put on notice both by the regulations in question (and by plain common sense) that their conduct was violative of the pertinent college standards contained therein and could result in severe disciplinary action. Esteban had knowledge of the college regulation that was reasonably calculated to give him notice he could not use vile language on and physically threaten authorized college personnel who in the course of their normal duties upon proper request reported his name to a faculty member. Roberds likewise should have known he could not be an active participant in a large student demonstration involving both illegal and destructive conduct."

290 F.Supp. at 630.

In affirming Judge Hunter's decision the United States Court of Appeals for the Eighth Circuit said in Esteban v. Central Missouri State College, 415 F.2d 1077, 1089 (1969):

" . . . Our attention has been called to the fact that Judge Doyle, in his recent opinion in Soglin v. Kauffman, 295 F.Supp. 978, 990–991 (W. D.Wis.1968), expresses disagreement with the observations of Judge Hunter on this aspect of the case. To the extent that, in this area, Judge Doyle is in disagreement with Judge Hunter, we must respectfully disagree with Judge Doyle.

\* \* \* \* \* \* \*

"We do hold that a college . . . may expect that its students adhere to generally accepted standards of conduct; that, as to these, flexibility and elbow room are to be preferred over specificity . . ."

Whatever the eventual outcome of the opposing arguments over the merits of general or specific rules of conduct for students, I feel confident in the finding

that in the present case William Fielder and Thomas DeCora—because of the regulation, previous disciplinary actions against them, and the common understanding of every student who reaches high school status—knew or reasonably should have known that repetitive skipping of classes, absences from school, and skipping of detention, which are subjects of the regulation, might lead to disciplinary sanctions, including expulsion.

## DUE PROCESS ISSUE

■ The procedures to be used under Nebraska law in expelling students from public secondary schools are outlined in § 79–449, R.R.S.Neb.1943. Simply stated, the statute requires that students be expelled only by action of the school board or board of education, although it may confer upon any teacher, principal, or superintendent the power to suspend temporarily a pupil, provided notice of such suspension is given at once in writing to the president of the school board or to an administrator or teacher designated by the board. The statute provides that if a student is expelled by the school board, the parents or guardian of the student shall be notified in writing of the expulsion and the parents shall have the right to appeal the action to the school board at the first regular meeting of the board following expulsion or suspension. Nothing in the statute requires, or forbids, prior notice to the student or his parents that action of expulsion may be taken by the school board. In the present case the action of expulsion was taken at the regular February meeting of the school board. Notice of expulsion was thereafter immediately sent to the parents, as required by Nebraska law. Although the parents had the right under Nebraska law to appeal the decision of the school board, they could not do so until the next regular meeting of the board, which, in this case, was approximately 30 days later. A possible result is, as happened in the present case, that a student may be expelled for as much as a month

prior to any hearing on the expulsion before the full school board.

This court is convinced that the procedures followed by the Winnebago school district in expelling the plaintiffs Fielder and DeCora were constitutionally impermissible. To the extent necessary for a resolution of this case and ones like it, at least, a procedure can be instituted by the school board which will meet the minimal standards required by the due process clause of the Fourteenth Amendment to the Constitution of the United States and also be in full compliance with Nebraska law.

Essential elements of due process in any given situation are difficult to determine. Some guidelines of *minimal* requirements are easily discernible. It can be said with confidence that at least "adequate notice, definite charge, and a hearing with opportunity to present one's own side of a case and with all necessary protective measures" are needed. Esteban v. Central Missouri State College, supra, 415 F.2d at 1089. Deprival of a student of a right to education is a solemn act, pregnant with painful consequences. "These days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." Brown v. Board of Education of Topeka, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954). The interest of the student in continuing his education is therefore great. By comparison, the interest of the state in expelling a student *before* a hearing is slight. In the great mass of situations there is no immediate danger to the public in the student's remaining in school until a fair hearing can be afforded.

■ Some situations may arise in which expulsion prior to a hearing is constitutionally justifiable, such as when the misconduct is so gross and the atmosphere of the school so tense that substantial disruption is highly probable unless instant expulsion is effected. In the present case no suggestion has been offered to the court that expulsion was prompted by any such need for swiftness.

Even if there were need for expulsion before a hearing reasonably could be held, the hearing should follow with dispatch. A 30-day delay between expulsion and a hearing is not consonant with the fairness which due process demands.

■■ The defendants argue in this case that full hearings were held approximately 30 days after the expulsion, that these hearings met all constitutional requirements with the possible exception of the lapse of a month prior to the hearings, and that another hearing now would accomplish nothing, because no defense was attempted at the hearings held a month after the expulsions. I cannot accept the argument. Whether all the concomitants of due process enumerated in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), are required in student expulsion cases, I cannot and should not now decide. In my judgment, however, due process in student expulsion cases, wherein there is no clear urgency for acting prior to a hearing, demands at least (1) a notice of the reasons advanced for the proposed expulsion, and (2) a hearing (a) held sufficiently after the giving of the notice to enable the student to prepare to respond to the reasons given, (b) at which the factual bases for those reasons can be refuted, if the student is able to refute them, and (c) at which cross-examination can be conducted of the person or persons primarily aware of the reasons being leveled for the proposed expulsion. See Ahern v. Board of Education, 327 F.Supp. 1391 (U.S.D.C. Neb.1971), aff'd 456 F.2d 399 (C.A. 8th Cir., 1972). It cannot be doubted that at the hearings of March 6 there was no opportunity for cross-examination of the persons primarily aware of the reasons for the proposed expulsion. It was the reporting teachers who primarily knew the facts and they did not attend the meeting. Failure of the plaintiffs or their counsel to ask for the presence of the teachers makes no difference. The obligation to furnish due process is on the school board, not on the students. Neither can it be said that no cross-examination would have occurred if the teachers had been there. What would have happened cannot be known.[5]

■■ It follows that the expulsions of the named plaintiffs were improper. In the temporary injunction issued March 16, 1972, I have specified procedural safeguards beyond those I here have denominated as minimal constitutional requirements. These additional procedures may or may not be constitutional requisites,[6] but whether they are or not, I think they represent good tech-

---

5. It reasonably may be said that what I have observed regarding opportunity for cross-examination does not apply to the plaintiff Thomas DeCora, because he did not appear at the hearing of March 6 and therefore could not have exercised his right of cross-examination, even if the teachers had been present. Nevertheless, I have included Thomas DeCora as a beneficiary of the temporary injunction, essentially for the purpose of fully discouraging, except in the most unusual situations, the expelling of students without a prior hearing.

I cannot and do not say that the board at its March 6 hearing was no longer an impartial tribunal because of its already having expelled and not reinstated the plaintiffs. "Certainly it is not the rule . . . that . . . a judge is disqualified from sitting in a retrial because he was reversed on earlier rulings. We find no warrant for imposing upon administrative agencies a stiffer rule, whereby examiners would be disentitled to sit because they ruled strongly against a party in the first hearing." National Labor Relations Board v. Donnelly Garment Co., 330 U.S. 219, 236–237, 67 S.Ct. 756, 765, 91 L.Ed. 854 (1947). See, also, Johnson v. Angle, 341 F.Supp. 1043 (Van Pelt, J., U.S.D.C.Neb.1971); Pangburn v. Civil Aeronautics Board, 311 F.2d 349 (C.A. 1st Cir. 1962); Wasson v. Trowbridge, 382 F.2d 807 (C.A. 2nd Cir. 1967). Compare Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); Pickering v. Board of Education, 391 U.S. 563, 579, fn. 2, 88 S.Ct. 1731, 20 L.Ed.2d 811.

6. For example, detailing the board's decision in a formal writing may well be unnecessary for due process. See Ahern v. Board of Education, 456 F.2d 399 (C.A. 8th Cir., 1972).

nique.[7] If they prove to be burdensome or awkward in practice, perhaps the court can learn from the experience of imposing them in this case.

7. School boards, as well as other units of government, should be models of fairness. Accordingly, a board should maintain a neutral position throughout the proceedings until it has before it both sides of the dispute. In seeking the expulsion of a student the *administration* of the school is taking a position adverse to the interests of the student. When that occurs, the rudiments of an adversary proceeding —although certainly not all the refinements of a court proceeding—should be observed. Notice to the student or his parent or legal guardian, preferably in writing, of the reasons being advanced for possible severe disciplinary action permits the student to know what to be prepared to resist and to have a basis for deciding knowledgeably whether to resist at all. Advance notice of several days (the number to depend upon the circumstances), preferably in writing, of the date of a hearing on the subject of the possibility of disciplinary action against him assures him a fair opportunity to prepare his resistance to the reasons being suggested for his expulsion or to decide not to resist. Permission to appear at the hearing with counsel will have the tendency to hold the proceedings to genuine issues and to assure the student's acting advisedly. Opportunity for cross-examination of the persons who *know* the primary facts which are the foundation of the proposed discipline and oppor-

tunity for the student to present his version of the facts, through himself, other witnesses, or documents, make for full exploration of the facts and guard against action taken on the basis of a one-sided interpretation of a set of circumstances. Delivery to the student or his counsel of a statement in writing of the board's finding of fact and the disciplinary action, if any, offers to the student unmistakable knowledge of what was done and why. That statement, together with any verbatim transcript that either side or the board wishes to make at its own expense, will provide an excellent and accurate record in the event of future litigation, thus minimizing the hazards of memory. Limiting the making of the decision by the board to the presentations at the hearing safeguards against the possible reliance by the board on unverified assertions and rumors against which no one can be expected in fairness to defend; and a written declaration by the board that it has made its decision solely from the presentations will tend to make it so.

I grant that failure to follow such procedures does not result inevitably in the making of a wrong decision. Neither does the following of them guarantee a right decision. Rules cannot make a decision-maker wise, but they can help him become knowledgeable and deliberate.