**LOUISIANA POWER & LIGHT COM-PANY, Plaintiff-Appellant,**

v.

**UNITED GAS PIPE LINE COMPANY et al., Defendants-Appellees,**

**Federal Power Commission, Intervenor.**

**No. 71-2550.**

United States Court of Appeals, Fifth Circuit.

Jan. 14, 1972.

Certiorari Granted March 6, 1972. See 92 S.Ct. 1198.

Thomas W. Leigh, Theus, Grisham, Davis & Leigh, Monroe, La., Andrew P. Carter, Eugene G. Taggart, C. King Mallory, Monroe & Lehmann, New Orleans, La., for plaintiff-appellant.

William C. Harvin, William R. Choate, Perry Barber, Houston, Tex., John T. Guyton, W. O. Crain, Jr., Shreveport, La., Baker & Botts, Houston, Tex., and Hargrove, Guyton, Van Hook & Ramey, Shreveport, La., for defendants-appellees United Gas and others.

Donald E. Walter, U. S. Atty., Shreveport, La., Gordon Gooch, Gen. Counsel, Leo Forquer, Sol., J. Richard Tiano, First Asst. Sol., George P. Lewnes, Asst. Gen. Counsel, George W. McHenry, Jr., Atty., F.P.C., Washington, D. C., for intervenor F.P.C.

Before THORNBERRY, MORGAN and CLARK, Circuit Judges.

CLARK, Circuit Judge:

The present nationwide shortage of natural gas generated this controversy.[1] First, we must make a construction of the Natural Gas Act [2] which will properly balance that Act's grant of jurisdictional power to the Federal Power Commission (FPC) over the transportation of natural gas in interstate commerce with the equally explicit Congressional directive that the Act shall not apply to so-called direct sales of gas—sales which are for consumptive use by the purchaser rather than for resale to others. This requires a determination of whether the grant of transportation jurisdiction confers a power to the FPC to now recondition certificates of public convenience and necessity it previously issued author-

---

1. This is a matter we have judicially noticed as eminent; see Southern Louisiana Area Rate Cases v. Federal Power Commission, 428 F.2d 407 (5th Cir. 1970).

2. 15 U.S.C.A. § 717–717w.

izing the construction and use of pipeline facilities to perform gas sales contracts between an interstate gas pipeline, United Gas Pipeline Company (United), and a utility company, Louisiana Power & Light Company (LP&L), which burns the contract gas under its boilers to generate electricity. Second, we must determine whether minor diversions of interstate gas have converted a wholly state-contained pipeline system to an interstate facility.

On preliminary motions by United and FPC, the district court, D.C., 332 F. Supp. 692, dismissed LP&L's complaint seeking an injunction requiring United to perform its contracts. The dismissal was based both upon a finding that LP&L had failed to demonstrate irreparable injury and upon the legal conclusion that proceedings pending before the Federal Power Commission, concerned with the same general subject matter, were "well within the [primary] jurisdiction of the FPC." We determine that the lower court erred, both in basing its decision on LP&L's failure to demonstrate irreparable injury at a preliminary hearing on its opponents' motions to dismiss, and in concluding that the FPC's claim of continuing certificate jurisdiction and its claim of jurisdiction over an asserted intrastate facility was free from doubt. We therefore reverse the order of dismissal and remand this action for further fact development on the issue of irreparable injury.

## BACKGROUND

In 1956 LP&L entered into a twenty-year contract with United calling for the delivery of natural gas to be burned under LP&L's boilers at its Sterlington Electric Generating Station in Ouachita Parish, Louisiana. The contract contained a provision entitled "Impairment of Deliveries" which provided that in the event a shortage of gas rendered United unable to supply the full requirements of all of its customers, then gas utilities reselling gas to domestic consumers and electric utilities using gas for the generation of electricity for domestic consumption would be first supplied by United, with any remaining available gas to be prorated among its other customers.

For many years United has also contracted with LP&L to sell it natural gas for LP&L's steam electric generating use at its Nine-Mile Point Generating Station in Jefferson Parish, Louisiana. This contract also contained an impairment of deliveries clause which provided that, in the event a shortage of gas made the available supply inadequate, available gas would be ratably prorated between gas utilities purchasing gas for resale to domestic consumers, and electric utilities using gas to generate electricity for domestic consumers.

Certificates of public convenience and necessity have been issued by the FPC covering all of United's facilities used to make deliveries to LP&L's Sterlington Station.[3] Deliveries to LP&L's Nine-Mile Point Station have never been certificated, since, until recently, all of the gas delivered to this station only traveled in a pipeline system, designated the "Green System," which gathered and disposed of gas wholly within the confines of the State of Louisiana. However, in 1970 United chose to divert 2.6% of the gas supplied under its Nine-Mile Station contract into the Green System from its interstate system, designated the "Black System."

In 1970 United petitioned the FPC for declaratory approval of a curtailment plan to meet an anticipated shortage of gas during the 1970–71 winter heating season and for an indeterminate time thereafter.[4] LP&L and other direct sales customers of United intervened. In its petition for intervention, LP&L maintained that the proposed curtailment program reached both direct sale and sale for resale customers and would violate

3. United Gas Pipe Line Co., 3 FPC 863 (1942); United Gas Pipe Line Co., 19 FPC 31 (1957), United Gas Pipe Line Co., 33 FPC 734 (1965), United Gas Pipe Line Co., 37 FPC 399 (1967), United Gas Pipe Line Co., 38 FPC 88 (1967).

4. Docket No. RP 71–29.

the terms in its contracts. LP&L denied that the FPC had jurisdiction to curtail direct sales contract deliveries through previously certificated transportation facilities.

United has also filed an application with the FPC to grant a certificate of public convenience and necessity to utilize the Green System pipeline facilities serving the Nine-Mile Point Station of LP&L. This proceeding bears Docket No. CP 71–89. LP&L has intervened. No decision has been rendered.

In March 1971, LP&L filed a complaint in the district court asserting jurisdiction based on diversity of citizenship. It sought and received a temporary restraining order requiring United to perform its contracts. The day following the issuance of this order, the FPC intervened in the case and the district court reversed its prior restraining order and dismissed the cause for lack of jurisdiction. After the district court refused to stay its order of dismissal, a single judge and, subsequently, a panel of this Circuit, stayed the dismissal of the district court action and entered an order providing in pertinent part:

> The case is remanded to the district court for an expedited hearing on the jurisdictional issue and on such other *preliminary* issues as may properly be raised. This Court expresses no opinion on the jurisdictional issue. At such hearing counsel for the parties and the intervenor may present evidence bearing on the jurisdiction of the court and on other appropriate *preliminary* questions. The distirct court will make appropriate findings of fact and state its conclusions of law. (Emphasis supplied.)

We add emphasis to the above quotation to point up that we did not direct that the court hear the case on its merits at the time it held the required jurisdictional hearing.

On remand, the district court held the hearing mandated and made Findings of Fact which included the following:

> All gas delivered by United to the Sterlington and Nine-Mile Point Stations is produced in Louisiana. All deliveries of gas to the Sterlington Station are interstate gas. Deliveries of gas to the Nine-Mile Station are made through the "Green" pipeline which is located entirely within the State of Louisiana. The great bulk of the gas in the "Green" line is intrastate gas. However, some gas is dumped into the "Green" pipeline from the "Black" pipeline. This is interstate gas so there is a co-mingling of intrastate and interstate gas in the "Green" pipeline.

> \* \* \* \* \* \*

> LPL has alleged (Complaint Paragraph 17) that the proposed curtailment by United could ultimately effect a "black-out" or "brown-out" which, under certain circumstances, could cover an area as large as the whole State of Louisiana, or, indeed, a several-state area such as occured during the notorious "northeast blackout" in 1965. The record is bare of any evidence to support this allegation.

The court additionally noted that LP&L has filed a registration statement with the Securities & Exchange Commission which not only did not disclose the pendency of the subject litigation as a suit which carried the potential of severe service interruptions, but also affirmatively stated that after June 1971 it expected to be able to offset any foreseeable gas curtailment by burning oil at its generating stations.

The Court concluded as a matter of law that the motions to dismiss filed by United and the FPC should be granted because LP&L had failed to establish irreparable injury and therefore was not entitled to injunctive relief. It alternatively based its dismissal upon the conclusion that LP&L was required to exhaust its remedies before the FPC rather than pursuing judicial relief since: (1) LP&L had not proved the extent of possible injury which might result from the pursuit of curtailment proceedings before the FPC; (2) those curtailment pro-

ceedings were well within the jurisdiction of the FPC; and (3) the expertise of the FPC was necessary for the proper consideration and disposition of the issues. All injunctive relief was vacated and the action brought by LP&L was dismissed. The present appeal arises from this action.

During the pendency of this appeal, the FPC rendered its Opinion No. 606 in United's curtailment proceedings, Docket No. RP–71–29. In this opinion the Commission concluded that it had plenary authority to allocate the gas supply of jurisdictional pipelines to *all* of the pipeline's customers, including customers who were previously certificated direct sale purchasers under long-term contracts, and that it should make such allocations in the form of tariff orders requiring curtailments of gas deliveries to all users of natural gas which United transported in commerce. The basis of the FPC's reasoning was that its power to make such curtailments was related to its jurisdiction over transportation and that its transportation jurisdiction "is and must be" of a *continuing* nature rather than being "insignificantly" limited to the initial grant or denial of a certificate of public convenience and necessity to construct the facilities used to make direct sales. The FPC determined that it must have jurisdiction to exert continuing control over the gas sold under such certificated direct sales in order to accord full protection to the public since state commissions could not reasonably be expected to formulate a uniformly fair plan for the apportionment of the scarce commodity. Thus, FPC asserts that the present gas shortage has created "new circumstances" giving rise to the "need" to continuously reevaluate previous certificates to make all pipeline sales fully compensatory and thereby use financial incentive to encourage exploration for and development of new natural gas supplies.

## PROOF OF IRREPARABLE INJURY

█ Both premises for the court's jurisdictional dismissal were based (one in whole and the other in part) on the determination that LP&L had failed to carry the burden of demonstrating its potential injury. In its sworn complaint in the district court, LP&L detailed its assertions of immediate and irreparable damage. In brief paraphrase, its allegations were these. LP&L supplied the electricity it generated to 46 of 64 parishes in Louisiana and had interconnections with all other electrical utility companies in Louisiana and most of the rural electric cooperatives in that State. Through this network it served the electrical needs of numerous domestic and industrial customers, as well as governmental subdivisions. Through other interconnections, it participated in an area-wide electrical grid network serving over 2,500,000 consumers, which was still further connected to power sources throughout most of the eastern part of the nation. A failure to be able to utilize the full generating capacity of the Sterlington and Nine-Mile Stations at peak demand periods could cause a wide area "black-out" or "brown-out" with damages beyond any means of calculation. It was further asserted that LP&L had relied upon United's contract when it constructed Sterlington Station, which had no full-capacity alternate source of energy for electrical generation and that, so long as United breached its contract commitment by curtailing gas deliveries, LP&L would lose electrical sales which could never be recovered because of the evanescent quality of its stock in trade, electricity, which could not be stored nor could it be delivered at any moment after the immediate demand for it had passed. The loss of such sales would be further irreparable since the fixed cost of basic generating facilities depreciated whether used or not.

The court found that the record on the preliminary hearing of the motions to dismiss for want of subject matter jurisdiction, under Fed.R.Civ.P. 12(d), was bare of any evidence to support the portion of these allegations relating to a possible "black-out" or "brown-out" of electrical power. This finding is cor-

rect, just as it is further true that the record is devoid of any evidence to support the remaining verified allegations of irreparable injury through lost sales. But, it is obvious why. At the commencement of the hearing [5] and in ruling on objections during its progress, the court made it abundantly clear that all evidence to be taken should be directed solely to the jurisdictional issue raised by the respective motions to dismiss of United and the FPC. Neither the defendant nor the intervenor had answered. No responsive pleadings other than these jurisdictional motions were on file. The case was not then being heard on its merits (or lack of them) as to the ultimate relief prayed for by the plaintiff.

The basic tenet of both prongs of the lower court's ruling—that LP&L had failed to demonstrate it would be harmed by any curtailment of gas deliveries under United's contract—was drawn from the examination and cross-examinations of J. M. Wyatt, a senior vice president of LP&L. On direct examination, Mr. Wyatt testified that at the time of this Rule 12(d) hearing, the Sterlington Station plant had no capability to utilize any alternate fuel other than natural gas and that the Nine-Mile Point Station was equipped to operate only one of its several units, and that unit only on an emergency basis for up to 36 hours, on No. 2 fuel oil. He further testified that after June of 1971 the company expected to have similar emergency capability to operate one unit of its Sterlington plant on such fuel oil. On cross-examination of Mr. Wyatt, counsel for the FPC brought out that registration statements filed by LP&L with the Securities and Exchange Commission contained assertions under the heading "Fuel Supply" which were inconsistent with the anticipated injuries which the complaint asserted would flow from the breach of United's contracts. Counsel for United brought out on his cross-examination of Mr. Wyatt, that LP&L had a separate natural gas supply contract term supply

of 66⅔% of the present fuel energy requirement for the operation of LP&L's Nine-Mile Point station, and that another LP&L-Texaco, Inc. gas contract had been made to cover additional fuel when a new generating unit went on-steam at this plant in 1973.

After an examination of the entire record, this Court concludes that the preliminary hearing record compiled in the court below was limited to a determination of the jurisdiction of the court vis-a-vis the jurisdiction of the FPC. The hearing had a somewhat unique procedural posture due to this Court's stay and remand for expedited disposition of the jurisdictional issue. This factor aids in making it abundantly clear that the court and the parties were proceeding on the assumption that the matter was being heard on defenses as to which the movants and not LP&L had the burden of persuasion.

This is not to say that a party moving for an injunction does not have the burden of showing irreparable injury. We only assert that the mandate of this Court remanded the cause to the district court for an expedited hearing on the jurisdictional issue and on other *preliminary* issues that were appropriate or properly raised. With no pleading challenge whatsoever to the facts stated in the complaint, and without notice of any kind to the parties that the matter was to be heard on its merits, the court improperly based its conclusions of law upon its finding of a failure by LP&L to carry a burden it did not know it was required to meet. *Cf.* Nationwide Amusements v. Nattin, 452 F.2d 651 (5th Cir. 1971).

■ Finally, as to the procedural aspect of this matter, we hold that it was error to use the preliminary hearing proceedings on Rule 12(b) defenses to dispose of this cause on its underlying factual merits. Except in unusual circumstances, and then only after clear notice, this course is improper. *See* 5

---

5. The hearing commenced with the court's announcement to *United's* counsel: "—— you are the mover, so you may proceed."

Wright and Miller, Federal Practice and Procedure § 1373; 2A J. Moore, Federal Practice ¶12.16.

 Aside from the procedural problem, the lack-of-proof-of-potential-injury bases for denial of injunctive relief and for requiring exhaustion of FPC remedies cannot stand on the undisputed matters which were developed. The fact that LP&L made statements to the Securities & Exchange Commission which can be read to be inconsistent with its claim that performance of United's natural gas contracts is an essential prerequisite to the operation of its plants, is a matter that could be considered if the defense of estoppel is raised or the equitable defense of unclean hands should become pertinent.[6] All we hold on this appeal is that the language of the filing posed against the sworn facts of the complaint and Wyatt's testimony would, at most, show that LP&L was guilty of misleading the investing public. If that be so, it is another lawsuit. There was no room for concluding from any fact shown in this record that LP&L had some alternate means of generating electricity except on a makeshift basis, or, even on that basis, for more than a day and a half.

Of course, proof of this type could be critical if proven facts left room for conflicting inferences as to whether loss of contract gas would indeed result in injury. The Nine-Mile Point Station contract arrangement with Texaco, Inc. would similarly present a substantial question in this respect. It apparently shows the ability to obtain ⅔rds of the needed supply of natural gas for this particular station for the next two years, and an even greater percentage of its needs for those years after the additional generating unit becomes operational.

What all of this may mean as to the relationship which the amount of gas contracted to be supplied to the Sterlington and Nine-Mile Point Stations by United bears to LP&L's ability and imperative need to generate electricity both to prevent catastrophic breakdown and irretrievable loss of sales, can only be determined by development of the evidence on the merits. What is the fuel need at each station? What are the alternate sources of energy supply? How much power can be exchanged (and at what ultimate loss or gain to LP&L) through interconnected sources? What are LP&L's usual and the peak demands? The record does not answer any of these questions, or the doubtless many more that will play into arriving at the final answer.

 In sum, we hold the district court erred in finding and concluding upon this record that LP&L had failed to establish that the breach of these contracts would not cause it immediate and irreparable injury, both because it improperly assigned the burden of proof to LP&L at this stage of the proceeding and because the record does not demonstrate that such injury is not likely to occur.

## FPC JURISDICTION

*The Direct Sales Exclusion vis-a-vis Continuing Certificate Jurisdiction (The Sterlington Station Issue).*

 The intent which motivated Congress at the time legislation was enacted must be the lode star constantly guiding the court which is required to construe their enactment. At first blush, it may seem trite to start this draft of the chart of our search for statutory meaning with so basic an axiom. But the changed circumstances of a new era are claimed in the strongest terms to have created an urgent *"need"* for the recognition of an authority to extend a granted power so deeply into an area where agency jurisdiction was expressly denied

6. Before this court, LP&L asserts that its registration statements do not even demonstrate a lack of candor with the Securities & Exchange Commission, since LP&L was entitled to assume that its contract commitment with United would ultimately be honored. However, we expressly eschew *any* hint of a ruling on this matter. It is no more pertinent to our review than it was to the preliminary decision below.

that, to paraphrase an old song, accentuating the affirmative eliminates the negative. This we cannot do. Such action does not fill in statutory interstices or resolve ambiguities in a law. It selects between competing policies which have been legislatively recognized in the same enactment and have been court-declared not only to be separate subjects of regulation, but also to have "independent and equally important places in the Act." Federal Power Commission v. East Ohio Gas Co., 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 reh. denied 339 U.S. 905, 70 S.Ct. 515, 94 L.Ed. 1334 (1950).[7] Such choices of policy belong to the Congress alone. In speaking to the effect of new experiences under this very Act and to the identical problem we face, the Supreme Court plainly specified that *Congress* was the institution vested with the power to adjust the law to correct deficiencies which were not originally anticipated. Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 522, 68 S.Ct. 190, 92 L.Ed. 128 (1947).

With our compass oriented to legislative intent, we turn to the Act itself and the authorities which have construed it to date. In the *Panhandle Eastern* decision cited above, the Court, while recognizing the undoubted power of Congress to define the distribution of power over interstate commerce, pointed out that the Natural Gas Act created an articulate legislative program creating a comprehensive regulatory scheme in which federal power complemented, but did not usurp, the existing authority of state regulatory agencies, 332 U.S. at 520, 68 S.Ct. 190. Congress was motivated by a desire to protect consumers against exploitation at the hands of natural gas customers, Sunray Mid-Continent Oil Co. v. Federal Power Commission, 364 U.S. 137, 147, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960), but it did not decide that this protection was to be accomplished by arrogating all control over interstate commerce in natural gas to the federal agency. "[M]uch authority was reserved to the States." Federal Power Commission v. Transcontinental Gas Pipe Line Corporation, 365 U.S. 1, 19, 81 S.Ct. 435, 445, 5 L.Ed.2d 377 (1961). Since a complete as well as a harmonious regulatory scheme was envisaged, an intent to leave no area of substance unregulated must also be recognized, and no "attractive gaps" should be created by judicial interpretation. *Id.* However, as Mr. Justice Black wrote in *East Ohio Gas Co., supra*, the location and breadth of such "gaps" must be adjudged in the light of what rights were defined by court precedents which existed *prior* to the time of legislation and not those since decided or which the courts would decide today. Without such a limit, judicial action would certainly become legislation.

The coverage of the Natural Gas Act has been so succinctly and aptly described by Mr. Justice Rutledge that it would be presumptuous not to quote:

> Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

> The omission of any reference to other sales, that is, to direct sales for consumptive use, in the affirmative declaration of coverage was not inadvertent. It was deliberate. For Congress made sure its intent could not be mistaken by adding the explicit prohibition that the Act "shall not apply to *any other * * * sale * * *.*" (Emphasis

7. Subsequent circuit decisions have articulated this principle by stating that while the FPC's power over transportation invests it with limited indirect control over non-jurisdictional direct sales, the grant of power and the reservation of such sales are separate aspects of regulation under the Act. *See e. g.*, United Gas Pipe Line Co. v. Federal Power Commission, 388 F.2d 385 (5th Cir. 1968); Panhandle Eastern Pipe Line Company v. Federal Power Commission, 359 F.2d 675 (8th Cir. 1966).

added.) Those words plainly mean that the Act shall not apply to any sales other than sales "for resale for ultimate public consumption for domestic, commercial, industrial, or any other use." Direct sales for consumptive use of whatever sort were excluded.

The line of the statute was thus clear and complete. It cut sharply and cleanly between sales for resale and direct sales for consumptive uses. No exceptions were made in either category for particular uses, quantities or otherwise.[8]

As is not uncommon when courts construe legislation over any appreciable time, subsequent decisions have made the clear "line of the statute" more and more crepuscular. One thing can be sharply discerned, the explicit prohibition of the statute denying jurisdiction over direct sales of gas for consumptive use has been consistently narrowed as courts and the FPC have increased the ambit of the jurisdictional grant over interstate transportation of such fuel. This has been done by analyses which recognized broad power in the FPC to grant certificates of public convenience and necessity in connection with the extension of pipeline facilities to service direct sales outlets.

The most significant decision construing the FPC's certificate jurisdiction is FPC v. Transcontinental Gas Pipe Line Corp., *supra*, which was decided after Congress had amended § 7 of the Act to greatly broaden the ambit of federal power. That case pointed out that in the original Act, § 7 [9] restricted certification to instances where a pipeline sought to serve an area already being served by another regulated company. In 1942, § 7 took its present form requiring certification of every facility subject to the jurisdiction of the Commission. The amendment intended to change the certificate function, which formerly looked only to control of competition between regulated pipeline companies, to one which considered both relative end use values and price effect factors.

This extension of the certificate function obviously detracted from the direct sale exclusion, but in *Transcontinental,* the Court affirmed that direct sales remained ". . . not subject to the Commission's jurisdiction *except insofar as § 7 requires the Commission to certificate the transportation of gas pursuant to the sale*." (Emphasis supplied.) Furthermore, in this same opinion, Chief Justice Warren avowed that § 7 powers of the FPC were limited. He observed that the Commission had sought but had not been awarded comprehensive authority over all aspects of gas conservation. His description of the power which Congress had been willing to confer on the FPC was the right to exercise a *veto power* over proposed transportation. 365 U.S. at 17, 81 S.Ct. 435.

■■ Against this background matrix of interpretive instruction, we must decide whether a new form of certificate jurisdiction never heretofore judicially recognized exists under § 7. The issue is: Does the FPC have the authority to modify or condition a certificate of public convenience and necessity issued for facilities used to make a direct sale? Or more briefly stated: Does the Commission have continuing certificate jurisdiction? The FPC asserts that it does, and that it *"needs"* to have this jurisdiction to make effective what it conceives to be the full extent of its regulatory powers. We deny this assertion. Even conceding that FPC powers are as broad as it asserts, no amount of need alone can create federal agency power if Congress has not expressly or impliedly granted it. Necessity may be the mother of invention, but need must have the paternal spouse—a legislative grant—to beget agency authority.

The grant of a continuing jurisdiction over certificates already issued might

---

8. Panhandle Eastern Pipeline Co. v. Public Service Commission of Indiana, *supra*, 332 U.S. at 516, 68 S.Ct. at 195.

9. 15 U.S.C.A. § 717(f).

well be implied from the broad powers vested over transportation under § 7. The *Transcontinental* case teaches that the FPC has the power to weigh and consider the end uses of gas in order to maintain the greatest benefit from the finite supply of this wasting natural resource. It is further empowered to consider the overall effect which prices to be paid by direct sale purchasers will have on field prices for jurisdictional uses. Such far-reaching powers clearly indicate that episodic State regulation could result in less efficient control than would centralization of all control in the FPC. Considered on these factors alone, the basic rules of statutory interpretation would call for a construction favoring continuing certificate jurisdiction. But! The Act itself expressly proscribes jurisdiction over direct sales and, as to such transactions, the recognition of continuing certificate jurisdiction would do no less than abolish the Act's exception of jurisdiction over sales for consumptive use, which has an equally secure and important place in the structure of the Act.

When any initial certification proceeding is pending before it, even one involving a direct sale, the Commission can exercise a *veto power* over the proposed transaction based upon its judgment as to whether the use proposed to be made is for a valid and efficient use, and whether the price structure would have a deleterious effect in consideration of its overall regulatory scheme. However, as to a non-jurisdictional sale, this power ceases under the Act as it is presently written when the certificate is finally issued, unless and until the right to abandon certificated facilities is requested.

Not only do we fail to find any precedent for establishing a new type of FPC authority in between its § 7(c) [10] veto power over the initial authorization to begin the use of a facility to transport natural gas in interstate commerce and § 7(b)'s [11] requirement that FPC authorization be obtained for abandonment of such facilities,[12] we find clear authority that no such continuing control over non-jurisdictional sales exists. The rationale of our own decision in Hunt Oil Company v. Federal Power Commission, 334 F. 2d 474 (5th Cir. 1964), indicates that a certificate has a permanency that is free from continuous FPC adjustment and control. In that case when we determined that the FPC had erred in refusing to permit a state public service commission to intervene in a proceeding which had resulted in the issuance of a certificate of public convenience and necessity, we not only authorized such intervention but required the FPC to set the certificate aside and start the proceedings anew. If there were a continuing revisory power in the Commission, the vacation of the certificate would have been unnecessary since the intervenor's rights could have been accommodated by adjusting the certificate.

Even stronger authority is found in the precedents from other circuits. In

10. In pertinent part, this section provides:
(c) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: . . . .

11. (b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment.

12. *See* United Gas Pipe Line Company v. Federal Power Commission, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181 (1966).

Granite City Steel Company v. Federal Power Commission, 115 U.S.App.D.C. 392, 320 F.2d 711 (1963), that court set aside an FPC order attempting to reallocate gas supplies between direct and resale sale customers. Although this proceeding relied on the proscription of § 7 (a) forbidding the FPC to compel a natural gas company to sell gas when such a sale would impair the company's ability to adequately serve existing customers, it is squarely based on the premise that, absent any § 7(b) issue of abandonment, a certificated direct sale cannot be indirectly controlled by the FPC. It is also worthy of note that the court observed that matters occurring after the Commission enters an order cannot be used to retroactively validate that order. Certainly the converse is equally logical —matters occurring after the issuance of a certificate cannot be used to invalidate the certificate, unless the Act confers a source of continuing authority to revise and amend that certificate. In Colorado Interstate Gas Company v. Federal Power Commission, 185 F.2d 357 (3rd Cir. 1950), the court quoted the identical language from the Supreme Court's opinion in *Panhandle Eastern Pipe Line Co., supra,* that we quoted above, and then stated:

> Nothing need be added to this clear statement of the coverage of the act. When applied to the problem before us it means that the power of the Commission to regulate the sale of natural gas by Colorado Interstate extends only to sales to buyers for resale and not to sales to buyers for their own consumption. That being the extent of the authority which Congress has conferred upon the Commission that body is without authority to compel Colorado Interstate to make its gas tariff applicable to any sales other than those for resale. It is beyond the power of the Commission to require a natural gas company within its jurisdiction to make its tariff applicable to sales which are not within the regulatory power of the Commission for

this would be in effect to regulate such sales.

Yet this is precisely what the Commission has undertaken to do in the situation at bar. Its opinion No. 606 requires United to file a plan for the curtailment of direct sales, including those made to LP&L under these contracts in the form of new and amended tariff sheets. *See also* City of Hastings, Nebraska v. Federal Power Commission, 95 U.S.App.D.C. 158, 221 F.2d 31 (1954).

Panhandle Eastern Pipe Line Co. v. FPC, 232 F.2d 467 (3rd Cir. 1956) is not to the contrary. In that case the Federal Power Commission had granted a pipeline company *conditional* certificates and, before the certificates were made final it required the company to file tariffs which contained interruptible priorities for excess gas. After this requirement was made by FPC, the pipeline company acquired new direct sales customers to absorb its excess gas supply and thereby attempted to circumvent the restriction. The Court refused to allow this negation of the FPC's requirement. This case turned upon the recognized jurisdiction vested in the Commission to consider end use and price factors in determining *initial* permanent certification, and not upon any recognition of a right of continuing certificate jurisdiction. The court distinguished rather than overruling or modifying its prior opinion in *Colorado Interstate Gas Company, supra.*

We also distinguish the 6th Circuit's 1949 decisions denying specific performance in one instance and injunctive relief in another as to disputes between a pipeline company and a purchaser of natural gas for resale. Michigan Consolidated Gas Co. v. Panhandle Eastern Pipe Line Co., 6 Cir., 173 F.2d 784, and Panhandle Eastern Pipe Line Co. v. Michigan Consolidated Gas Co., 6 Cir., 177 F. 2d 942. Authority over the interstate gas sale of a pipeline company and a purchaser for resale which was sought to be court-litigated, was clearly vested in the FPC. That is not the case here.

The Commission contends that the provisions of § 4(b),[13] which prohibit regulated pipeline companies from granting undue preferences respecting transportation of gas subject to the Act, when coupled with § 5(a),[14] authorizing FPC elimination of such practices, grant the authority to exercise continuing supervisory authority over all aspects of certificated direct sales transactions. This contention is but another form of the proposition advanced under § 7 which we have dealt with above. Carried as far as the FPC urges, it would bring the agency's transportation authority into irreconcilable conflict with the Act's equally viable express direct sale reservation.

Summarizing, we hold that the FPC has no form of continuing certificate jurisdiction over direct sales to customers of interstate pipeline companies. It has the initial right to issue or veto a certificate of public convenience and necessity and it must give its approval to the abandonment of the use of the certificated facilities, but between the two functions the express exemption of regulatory power over such consumptive sales bars agency intervention.

*Has the "Green System" Become Interstate? (The Nine-Mile Station Issue.)*

There is no dispute in the record as to any fact bearing on this point.

All of the gas moving to the Nine-Mile Point Generating Station is delivered through the Green pipeline system, which is located entirely within the State of Louisiana. All gas consumed at the station is produced in Louisiana. During 1970 United chose to fulfill 2.6% of its contract commitment with gas which was flowed a portion of its way from certain Louisiana wells to a valve connection to the Green system, through United's Black (interstate) pipeline system. It is particularly significant that this minor amount of interstate gas had been introduced *into* the Green system, and that no intrastate gas could flow *from* the Green system into the Black system because of the pressure differential between the systems. Although a physical connection permits the Black to Green flow, the two systems are otherwise entirely separate facilities. Approximately 4,000,000 Mcf units of gas were added to the Green system from the Black system in 1970 out of a total of more than 155,000,000 Mcf units which were delivered by the Green system that year. Through an affiliate, United controlled gas wells in Louisiana (which wells were equipped to deliver fuel to both the Black and Green systems, but in fact delivered only to the Black system) that produced more than the entire amount of gas diverted from the Black system into the Green system in 1970.

United and the FPC rely upon this circuit's holding in Louisiana Public Service Commission v. FPC, 359 F.2d 525 (5th Cir. 1966), commonly called the Florida Parishes case, to show the Green system must now be certificated. LP&L argues that since United had within its control the power to meet its obligations to Green system customers using only intrastate gas, the fact that it chose at times to co-mingle a small amount of otherwise intrastate gas with interstate gas and then redeliver it to the Green system, distinguishes the Florida Par-

---

13. No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service. 15 U.S.C.A. § 717c(b).

14. Whenever the Commission . . . shall find . . . that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.
15 U.S.C.A. § 717d(a).

ishes situation and gives United no basis for seeking to transfer the Green system from Louisiana to federal control.

In determining whether a particular gas delivery system is subject to federal regulation neither contract stipulations nor other conventions or legal fictions control. The court must examine "the anatomy of the pipeline system to discover the channel of constant flow" to see if, in fact, gas crosses a state line at any stage of its movement from wellhead to ultimate consumption. If it does, it is interstate gas. People of the State of Calif. v. Lo-Vaca Gathering Co., 379 U.S 366, 85 S.Ct. 486, 13 L.Ed.2d 357 (1965); FPC v. Amerada Petroleum Corp., 379 U.S. 687, 85 S.Ct. 632, 13 L.Ed.2d 605, reh. denied 380 U.S. 959, 989, 85 S.Ct. 1081, 1327, 13 L.Ed.2d 976, 14 L.Ed.2d 283 (1965).

The lower court held that this analysis of constant flow required agency expertise and that it should refuse to exercise its jurisdiction and require exhaustion of administrative remedies. Without adopting any sweeping or dogmatic contrary rule for every imaginable case, we disagree in the case at bar. The solution to the legal problem here depends upon simple flow mechanics, which are demonstrated in this record by uncontradicted evidence. It requires no expertise to determine that the channel of constant flow, insofar as the gas passed through and consumed from the Green system is concerned, is essentially within the State of Louisiana. There is no attempt here to clothe interstate gas with an intrastate or non-jurisdictional sale character by contract language as was present in the *Lo-Vaca* and *Amerada* cases, *supra*. The intrastate character of this sale is based on substance— the physical movement of gas—not on any formalism or technicality.

The Florida Parishes case is equally factually distinguishable. There, gas from Louisiana wells was collected and delivered into large high-pressure gas transmissions mains which transported substantial volumes of gas in interstate commerce to points in Mississippi and Alabama. Lateral connections from these main pipelines were used to serve towns in Louisiana. The court described the lines as "part of a fully integrated system by means of which United transports and sells gas from the states of Texas, Louisiana and Mississippi to industrial customers, pipeline's and local distributors in those states and in Alabama and Florida." An analysis of the anatomy of constant flow in the single system which served these towns demonstrated that gas had to move through interstate facilities to reach them. They did not receive their gas through a distinct and geographically localized system such as the Green system here.[15] The *Amerada* case also is physically distinct. Although more of the gas which the contracts there attempted to classify as intrastate actually flowed in interstate commerce in the summer months, a substantial volume flowed in the winter months also. Thus, analysis showed a constancy of interstate movement. The *Lo-Vaca* case presented an attempt to contractually formalize two gas sales which moved through an interstate pipeline as direct sales and were therefore exempt from regulation. The Court disregarded the contract language and looked to see, not only that these sales were only a portion of the volume of interstate gas moving in a single system, but also that a portion of this gas was in fact resold outside of the state where it was produced.

In contra-distinction to each of these cases, the flow of gas from the Black system into the Green system in the case at bar is occasional and irregular, as well as minimal. The Green system, as an entire and separate unit, is physically located and functions entirely in Lou-

---

15. In fact, our Florida Parishes opinion was careful to point out:
 the question under consideration has no relation to United's purely intrastate pipeline facilities which are completely separate from its interstate system and over which the commission has not asserted jurisdiction.

isiana. Therefore, the undisputed facts show that the channel of constant flow is an intrastate and not an interstate channel. The regulation of the Green system is substantially and essentially a localized matter committed to Louisiana's jurisdiction.[16]

*Do FPC Proceedings Bar Court Relief?*

■ Both United and the FPC contend that the curtailment proceedings in Docket No. RP 71–29 and the certificate proceedings in Docket No. CP 71–89 are within the jurisdiction of the FPC and that the court was correct in dismissing the present action. All parties cite numerous precedents, most from the Supreme Court. An attempt at rationalization would needlessly lengthen this opinion. The entire area has been thoroughly analyzed by a leading text in the field. It collects and discusses most of the authorities relied on by both sides. It was relied upon by the court below and we rely upon it here. *See* 3 K. Davis, Administrative Law Treatise §§ 20.01 through 20.03.

Because we hold the lower court erred in its holding regarding potential injury and in its views as to primacy of agency jurisdiction, we arrive at a different result in applying Professor Davis' three-part test (§ 20.03).

*See* Bailey v. United States, 451 F.2d 963 (5th Cir. 1971) and *cf.* United States v. Hernandez, 453 F.2d 297 (5th Cir. 1971).

*Is This Appeal Moot?*

■ United also urges that the rendition of the FPC's Opinion No. 606 has rendered the present action moot. We disagree. That opinion is subject to court review under § 19 of the Act.[17] An appeal has been taken by LP&L to this court from Opinion No. 606 and is now pending as Cause No. 71–3429. Thus, there is an unusual confluence of reviews in this court in the matter *sub judice*. However, until affirmance upon the completion of court review, FPC Opinion No. 606 is not a final determination of the issues presented. It would be a strange, Frankenstein sort of legislative delegation that would empower the agency it creates to declare its own extent. Without at all intimating what weight should ultimately be assigned to the conclusions of Opinion No. 606, we are firm in our conviction that it does not oust the adjudicatory power of a court that has reviewing authority over both the court and the agency proceedings.[18]

CONCLUSION

LP&L had no burden to demonstrate that its allegations of irreparable injury were correct on the preliminary hearing of its opponents' motions to dismiss. The FPC lacked jurisdiction over the previously certificated direct sales to Sterlington, and over the intrastate sales at Nine-Mile Point; therefore declining jurisdiction and requiring exhaustion was error. The order dismissing this cause is reversed and the cause is remanded with directions to expedite the hearing and disposition of this cause on its merits.

Reversed and remanded, with directions.

---

16. LP&L has urged that the clearly erroneous review standard of Fed.R.Civ.P. 52(b) must be applied here. We note, however, our ruling does not involve any disagreement with facts found by the district court. We only differ with the interpretation he places on undisputed evidence. Such interpretations are reviewable "free from the restraining impact of the so-called 'clearly erroneous' rule". See B & M Company v. United States, 452 F.2d 986 (5th Cir. 1971).

17. 15 U.S.C.A. 717r.

18. If Opinion No. 606 has any instant effect it may be contrary to United's urging. In the sense that it is a final agency action, its finality could militate against United's claim that the agency's primary jurisdiction still bars court action. However, without pausing to consider the ramifications of collateral versus direct review rights since both court and agency action are before us now, we express no opinion on this aspect of the matter.