**D. F. GLOVER**

v.

**Harold T. DANIEL, Individually and as Superintendent of Schools of Pike County, Georgia, and Pike County Board of Education.**

**Civ. A. No. 890.**

United States District Court,
N. D. Georgia,
Newnan Division.

Aug. 7, 1969.

Howard Moore, Jr., Peter E. Rindskopf, Atlanta, Ga., Jack Greenberg, New York City, for plaintiff.

Caldwell & Bridges, Thomaston, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

This case was tried by the court without a jury on a single issue: Whether the failure to rehire the plaintiff as principal of the Pike County schools for the 1969–70 school year was or was not for racial reasons in violation of his civil rights.

The court concludes that plaintiff, having the burden of proof, has not proved his case. The evidence, at best, shows no more than deep-seated suspicions on plaintiff's part, unsupported by the record and in some areas shown to be without foundation. The evidence also discloses an attitude and course of conduct on the part of plaintiff which sufficiently demonstrates to this court that the recent orders of the court requiring desegregation of the Pike County schools can never be carried out with any hope of harmony so long as plaintiff remains the central bone of contention within the Pike County system. Finally, in the opinion of the court, there were valid nonracial reasons justifying plaintiff's discharge.

In the main, plaintiff sought to prove his case by the testimony of the defendant Superintendent and other teachers in the school. In fact the only testimony he gave himself bearing directly on the question as to why he thought his discharge was racially motivated was to the effect that he had given 19 years of good service, that he was professionally trained, and that he could think of no other reason for his discharge other than race. He did testify that the Superintendent told him he talked too much at principals' meetings and that on one occasion, after his discharge and when the County Board met to reconsider its action, one Board member said he wouldn't vote to rehire plaintiff because none of the white folks wanted him. At about the same time, however, the same Board voted to hire another Negro principal in his place.

The defendant Superintendent testified that plaintiff's contract was not renewed because his continued employment was "not in the best interest of the school" and because of his "lack of cooperation." He cites six instances or occurrences as justifying these conclusions. We will discuss them presently, after a brief history of the school difficulties in Pike County.

The school population and faculty of the Pike County system are both about evenly divided between the races. Prior to the 1968–69 school year the schools were operated on a segregated basis. Beginning with that year a rather substantial step was taken to integrate the first grade, but elsewhere integration was only token. Prior to '68–'69 the schools had four principals, two of whom were white and two black. At the beginning of the '68–'69 school year one of the Negro principals resigned to take a job elsewhere, and when the County Board undertook to replace him with a white lady, the Negro students boycotted the school. As a result, the white lady resigned two weeks later—and was replaced by a Negro. Thereafter, a suit to desegregate the schools was filed in this court (No. 862) and after a hearing in November of 1968, the schools were ordered to completely desegregate by combining all grades not later than the '69–'70 school year. A final Jefferson-type decree was entered to that effect in January, 1969. In the meantime, however, the County Board had declined to renew

plaintiff's contract as principal and the present action was filed. It thus appears that while the issues in this case and in the desegregation suit are not the same, they are completely interrelated. Against this background we go to the events leading up to plaintiff's discharge or, more precisely, to the failure to renew his contract for the '69–'70 school year.

The defendant Superintendent relies on six occurrences as showing "lack of cooperation" on the part of plaintiff and as demonstrating that the renewal of plaintiff's contract was "not in the best interest of the school":

> *First*, defendant says that the plaintiff failed to cooperate by refusing to hold fire drills as required by accrediting regulations and state law;

> *Second*, that he was careless in failing to secure school buildings at night so that burglaries resulted;

> *Third*, that plaintiff failed to attend a series of regional meetings conducted at Griffin, Georgia, by the State University and by a national testing service, at which meeting desegregation plans were discussed;

> *Fourth*, that plaintiff failed to cooperate and, in effect, made impossible the giving of certain achievement tests to be used in connection with the proposed desegregation;

> *Fifth*, that plaintiff defied the Superintendent and the School Board in connection with their decision to replace a resigned Negro principal with a white principal, thereby causing a student boycott, and

> *Sixth*, that plaintiff violated school regulations and made principals' meetings impossible by refusing to abide by a school decision as to the text books to be used.

In delineating the testimony about these charges, the court will deal with them in something like their chronological order and not necessarily in the order of their importance.

## THE REPLACEMENT OF THE PRINCIPAL WHO RESIGNED

At the beginning of the 1968–69 school year one of the Negro principals in the County voluntarily resigned to take a better job with another system. Under the practice followed in Pike County the appointment of new principals was made by the School Board on the recommendation of the defendant County School Superintendent. At a teachers' meeting shortly after the resignation of the principal (Frazier), his letter of resignation was read by Defendant Daniel. In the letter Principal Frazier not only tendered his resignation but recommended two persons as his successors, one of whom was the wife of plaintiff. The defendant, however, and later the County Board, did not follow this recommendation, but instead announced the appointment of a Mrs. Elkins as successor to Principal Frazier. Mrs. Elkins was a white teacher in the system and though she was not then acting as a principal, she had previously had experience as a principal. Upon this announcement being made, plaintiff gained the floor at the meeting and announced that he "could not go along with this appointment", his reason being that the resigning Negro principal should be replaced by another Negro. According to the witnesses, the words, attitude, demeanor and tone of the plaintiff at the time of his announcement were intemperate, accusatory and demanding. As one teacher testified: "Now, I've been around school a pretty good while and I've never, just never seen a principal talk to a Superintendent in a manner, not exactly what he said, but in the manner of which it was conducted. I'm just not used to that tone of voice or anything else, from a principal talking to a Superintendent." Going back to the plaintiff's actual remarks, he further stated that the Negro community had not been consulted in the choice of this principal, that they would not stand for it, and that the Board would hear from them later. The defendant and the other teachers listened to his remarks, but the Board neverthe-

less appointed Mrs. Elkins. Shortly thereafter, on September 10th, the Negro students in plaintiff's school absented themselves from class and began a strike or boycott against the school which lasted for approximately eight days.[1] During this period, meetings were held, demands and counter-demands were made, and in general the situation became so bad until two weeks later the newly appointed white principal resigned and was replaced by a Negro principal. Plaintiff testified that the boycott was brought about by the appointment of a white principal. In his testimony plaintiff does not state his connection with the boycott, but from all the circumstances the court is constrained to find, and does find, that he either instigated or encouraged it. For example, when interrogated by the court as to whether a boycott was the proper means of redressing such a grievance, plaintiff testified, "I would agree that this ought not to be done, but when you get into a situation where you can't deal with the people who are responsible, it might cause this type of thing to happen." It was shortly after this episode that the desegregation suit was filed.

### THE BURGLARIES

During October and November, 1968, plaintiff's school was burglarized on three occasions, and certain televisions and typewriters were taken. The school in question was in a rural area and from time to time before and after these burglaries the defendant Superintendent had been advised by the Sheriff that he had found the school building unlocked or the windows open on his patrols. Based on these circumstances, the defendant concludes that plaintiff failed to cooperate in keeping the building secure. Plaintiff's contention with regard to the burglaries was that they had a terrific turnover of janitors at the school and that this resulted from the fact that they were underpaid. There had been at least one burglary in another school during the year and conceding that plaintiff was careless in not making sure that the windows and doors of the school building were closed and locked overnight, this, standing alone, would hardly justify plaintiff's discharge after 19 years of service.

### THE FAILURE TO HOLD
### FIRE DRILLS

According to the testimony, state law requires eight fire drills in a school year, whereas the Accreditation Board requires one per month, or nine. During October of 1968, a Fire Marshal went to the plaintiff's school, at which time, according to the testimony of the defendant Superintendent, Mr. Glover admitted to the Fire Marshal that he had not had a fire drill during that school year. The Fire Marshal also reported to the Superintendent that on his visit to the plaintiff's school he asked plaintiff to hold a fire drill at that time, to which plaintiff responded that he was "too busy" and "had too many activities going on at the time", and for that reason the fire drill was not held. Plaintiff testified that he complied with the fire drill requirements but that he may have told the Fire Marshal that he had not had one for that month. He denies that he ever told the Fire Marshal that he was too busy and says that when the Marshal asked him about holding fire drill that day, he pointed out to the Marshal that the students at that time were on their lunch hour and that was not a proper time to hold a fire drill. Again the court finds that the plaintiff was guilty of some negligence or carelessness in connection with fire drills, but again the court does not

---

1. It is of collateral interest, though perhaps not of probative value here, that after plaintiff's contract was not renewed another protest boycott by black students ensued just before the end of the '68–'69 school year (May, 1969) and a majority of the black students remained out of school for the final 29 days of school. (See pp. 290–293 of the record.) This led this court to issue an injunction against plaintiff and certain others acting in his behalf against certain acts being committed on or near school property.

consider this a controlling factor leading to the failure to renew the plaintiff's contract.

## THE DESEGREGATION MEETINGS AND ACHIEVEMENT TESTS

Between October of 1968 and May of 1969 the University of Georgia held a series of regional meetings in anticipation of school desegregation. At these meetings talks were given by University professors on how to teach disadvantaged children, teacher-pupil ratios were considered, the original desegregation order of this court in November and the final order in January were also discussed, as well as teacher transfers between schools. Notices of these meetings were sent out by the State University to all of the principals in the Pike County system. The defendant did not specifically direct plaintiff to attend these meetings. Plaintiff's teachers, however, and all the other principals did attend but plaintiff did not.

At these meetings one of the things being considered in furtherance of the anticipated desegregation was the best method of remedial teaching for those students who were behind their grade in one or more subjects. In this regard one of the assistant principals, who worked with the fourth, fifth and sixth grades, proposed that (in his grades at least) the County go to a "non-grade" system. Under this system, which is apparently widely used around the country, a child would not be designated as being in the "sixth grade" but as being in the "sixth year." Upon reporting to school, all children in the "sixth year" would be permanently assigned to the same "home room" but would not necessarily be doing the same work in every subject. Instead, each child, as to each subject, would be assigned to work with a group whose skills and achievement were comparable to his own. Thus, as between two children in the same "home room" in what had formerly been the fifth grade, one child might be doing fourth grade work in math and sixth grade work in reading, while the other was doing fourth grade work in reading and sixth grade work in math, the object being to teach each child to the extent of his capacity and in keeping with his achievement in each subject without having to "flunk" him in the fifth grade for being behind in part of his work. Provision was to also be made for remedial teaching to bring up those who were behind. To institute this system it was obviously necessary to ascertain and establish the skill and achievement level of each student in each subject at the time the system was to go into effect.

The proposal was discussed at faculty meetings and with parents, and a series of tests were obtained from the California Testing Bureau to be given to the (then) third, fourth and fifth grades in all schools, white and black. The tests were to be given by a team consisting of four teachers, two black and two white, and were to be graded by a machine.

The colored children in the third, fourth and fifth grades were under the supervision of the plaintiff, and when the tests were sent to his school to be given to his students, the students made the tests impossible by refusing to complete them, mutilating the test papers, furnishing no answers, or erasing what they had written. Plaintiff admits that he is opposed to tests, and when he was told that his students were not taking the tests he made no effort whatsoever to see that they were taken or to encourage his students to take them. He testified that he was against testing because he thought that standardized tests were racially biased and that the parents had told their children not to take them because they thought the tests were intended to resegregate their children. He also stated that he entertained the same view. As he says, "Black people were not brought in on the planning for the tests and we were suspicious of the purpose." He further testified that notice of the tests "also made us suspicious because white teachers participated in giving them in black schools." Finally, as he says: "I decided not to do anything because I felt I had been left out of the

total planning and maybe I shouldn't interfere * * * I am opposed to testing."

The court again is constrained to find, and does find, from all the circumstances, that plaintiff deliberately absented himself from the Griffin meetings which it was important that he attend, and that by deliberate action or non-action he sabotaged the tests. The court further finds not a scintilla of evidence to support his suspicions that racial motives were involved and further finds that if he had attended the meetings he would have known better. The court concludes that plaintiff's attitude and conduct with respect to these two charges, even if they stood alone, were sufficient to justify the defendant and the Board in not renewing his contract. At the time of the tests the desegregation order of this court had been entered and if plaintiff's suspicions had later proved correct he had only to bring the matter to the attention of the court.

## THE SELECTION OF TEXTBOOKS

Standing alone, this charge might be just another bagatelle. However, it does shed light on plaintiff's contentious attitude and suspicious disposition. At a faculty meeting to select first grade textbooks for the following year the teachers voted to continue with a series published by the American Book Company. Apparently this vote was influenced in part by motives of economy since the system already had a number of these books on hand. Again plaintiff took the floor and protested this decision, insisting that the system adopt a "multi-ethnic" series in which the pictures showed children of both races. In Georgia the textbooks to be used are selected from a list approved by the State Board of Education, and at that time there were no "multi-ethnic" books on the list. This was explained to plaintiff and assurances were given that when and if a "multi-ethnic" series became available they would be made available, at least insofar as plaintiff's students were concerned. Plaintiff, however, was adamant and according to defendant and some of the teachers, plaintiff's attitude and remarks broke up the meeting. In fact there was testimony that as a result no further faculty meetings were held. Later in the year a "multi-ethnic" edition did become available in the American Book Company series and copies were supplied to plaintiff. The schools now use some "multi-ethnic" books, the defendant testified he had no objection to them, and one teacher testified that when the system is completely integrated he didn't see how they could get by without them.

## CONCLUSION

In view of its findings the court might well decide this case on the ground that the failure to re-employ plaintiff was justified. The court is of this opinion. But that is not the precise question presented. What the court does conclude is that plaintiff has not shown that his discharge was for racial reasons. Nor is this conclusion altered by the fact that plaintiff's actions and attitudes may have been provoked by his suspicions, sincerely entertained, that racial bias was being practiced elsewhere. Such practices, if they exist, will have to be litigated in some other proceeding, brought for that purpose. The question here is whether racial bias was practiced or shown as to *him*. In the opinion of the court it was not. In school matters and among teachers, white or black, the County School Superintendent is "boss"; and while a teacher undoubtedly has the right to disagree with the boss and even to tell him off, it has nothing to do with race to say that he does so at his peril. Unquestionably, the First Amendment gives a teacher the right to speak his mind; but it does not give him the right to disrupt a school or to choose its principals or to sabotage its programs. *See* Tinker v. Des Moines School District, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L. Ed.2d 731, et seq. The court concludes that it was plaintiff's action in these areas, and not racial bias, that brought about the termination of his contract.

The prayers of plaintiff's petition are therefore denied. In the interest of future school and community harmony, however, it is ordered that plaintiff's former position be filled with a Negro principal, either by promotion within the present Negro faculty or otherwise. Further ordered that if no suitable Negro principal can be found for the '69–'70 school year, no white principal be employed for the position except on an interim basis until a suitable Negro principal can be located.

It is so ordered.