352 F.Supp. 613 (1972)
Beauregard BIRDWELL (Teacher in the Hazelwood School District), Plaintiff,
v.
HAZELWOOD SCHOOL DISTRICT a public body corporate, et al., Defendants.
No. 71 C 337(4).
United States District Court, E. D. Missouri, E. D.
December 27, 1972.
*614 *615 Moser, Marsalek, Carpenter, Cleary, Jaeckel, Keaney & Brown, St. Louis, Mo., for plaintiff.
Don O. Russell and Richard O. Funsch, St. Louis, Mo., for defendants.

MEMORANDUM
WANGELIN, Distict Judge.
This action is before the Court for a decision upon the merits following a trial to the Court without a jury.
Plaintiff, a former Hazelwood Senior High School teacher, brought this action against the Board of Education of the Hazelwood School District, St. Louis County, Missouri, the members of the Board individually, and three administrative officers of the Hazelwood School District, alleging violations of 42 U.S.C. §§ 1981 and 1983 seeking reinstatement, back pay, injunctive relief, and, in the alternative, money damages for breach of contract in the amount of $100,000.00 for the alleged violation of plaintiff's constitutional rights of free speech and due process of law. Jurisdiction is founded upon 28 U.S.C. § 1343(3) and (4).
The complaint originally was brought in three counts. Count I alleged that under color of state law plaintiff was dismissed from his teaching position because he informed his students of his opposition to a campus visitation by military recruiters, in violation of his right *616 to free speech as guaranteed by the Fourteenth Amendment to the Constitution of the United States. Count II alleged the denial of a hearing required by the Due Process of law before he was dismissed. Count III alleged that plaintiff was dismissed without being provided with a written statement of reasons and without being given the ninety days' notice required by Section 168.126, RSMo 1969, V.A.M.S. Count III is not based upon an independent jurisdictional allegation.
By order filed November 30, 1971, the Court dismissed Count II for the reason that under applicable state law plaintiff was not entitled to a hearing. However, because of subsequent Eighth Circuit cases treated below the Court has reconsidered the dismissal of Count II.
By amended complaint the Hazelwood School District was substituted as a party defendant in place of the Board of Education.
This action was tried to the Court sitting without a jury on February 28, 1972. The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

FINDINGS OF FACT
1. During the month of August, 1969, plaintiff applied for a teaching position with the Hazelwood School District. He had been employed as a teacher during the preceding year by Mary Institute, a girls private combined grade school and high school. He left Mary Institute at the suggestion of the school administration following a police incident involving drugs; plaintiff had been arrested but the charge was later dismissed.
2. Under the provisions of a written Teacher's Contract dated September 4, 1969, plaintiff was hired by the Hazelwood School District to teach algebra and geometry to first and second year students for a term of 9½ months for the annual sum of $8,265.00. Plaintiff taught that academic year without incident.
3. Plaintiff's employment by the Hazelwood School District was continued by the execution of a written Probationary Teacher's Contract dated April 9, 1970. This contract was for a term of 9½ months beginning August 31, 1970, at the annual salary of $9,060.00. This contract provided in pertinent part as follows:
3. The Probationary Teacher agrees to enter upon and perform the services of a teacher at the times and places and for the duration of this contract and perform all duties of a teacher faithfully and satisfactorally and as directed by the Board of Education, acting through its designated employees; to comply with and abide by all reasonable rules and regulations promulgated by the Board of Education; and to comply with and abide by all pertinent statutes and laws of the State of Missouri; including but not limited to the provisions of the Missouri Teacher Tenure Act, Section 168.101 to Section 168.116, both inclusive, V.A.M.S., and amendments thereto, which are hereby, by reference, incorporated in and made a part of this contract as though set forth herein at length.
* * * * * *
6. It is hereby mutually agreed by and between the parties hereto that nothing herein contained shall operate or be construed as a waiver of any rights, powers, privileges or duties of either party hereto by or under the Laws of the State of Missouri.
4. A similar written contract dated April 1, 1971, was executed to cover a term of 9½ months beginning September 3, 1971, at an annual salary of $9,305.00. Plaintiff returned this contract to the school.
5. During the 1970-1971 school year plaintiff taught Algebra II at Hazelwood High School, a three year secondary school. In plaintiff's classes were students of all three years.
6. During the Fall term of 1970 the Hazelwood High School administration *617 promulgated an oral policy whereby faculty members who wished to invite visitors or speakers had to apply for administration approval before the visitors or speakers were allowed to come onto the campus. The administration in implementing this policy had been mindful of a previous disruptive incident at another local high school. This policy had been in effect before this time but was republished for emphasis.
7. Plaintiff felt that this visitation policy allowed the school administration to prohibit any visitor suggested by the faculty but allowed the faculty no such control over visitors invited by the administration.
8. During the morning of March 30, 1971, while at school plaintiff heard an announcement that a Reserve Officer Training Corps ("R.O.T.C.") representative would be in the school that day to discuss R.O.T.C. programs with students. Thereafter on that day plaintiff spoke twice in the school hallways with school Principal Lawrence Fuqua about this R.O.T.C. visitation in light of the school's visitation policy. The first of these discussions between plaintiff and Principal Fuqua occurred when plaintiff stopped Fuqua in the hallway and asked who had invited the R.O.T.C. representative. To this question Principal Fuqua answered that he had invited the representative and that the representative was his own son. Plaintiff replied that he did not think that R.O.T.C. had a right to be on campus. Principal Fuqua responded that he believed the R.O.T.C. did have such a right. Principal Fuqua then enquired of plaintiff how he would enjoy being in a country that did not have the benefit of military protection. Principal Fuqua asserted that he would decide who would be allowed on campus.
9. Later that same day plaintiff approached Principal Fuqua near the latter's office to explain that he felt that the students and faculty should decide who comes onto the school campus. Fuqua testified that he responded, "Mr. Birdwell, according to Missouri law the Board of Education is charged with the operation of the schools and they have delegated me as principal to operate the school and it's my responsibility to operate the school in the manner that the Board of Education would like me to and that's my responsibility and mine alone to determine who is on campus and who is not. You are not involved in this and you're not to pursue it any farther."
10. No other incident occurred between plaintiff and Fuqua until May 19, 1971. At the beginning of the second period on that day over the school's public address system the announcement was made that United States Army recruiters would be in the building and students were invited to speak with them. The announcement came at the beginning of the period during the portion of the class period normally set aside for announcements. During this period plaintiff was conducting a class in Algebra II for students of all three school years.
11. Plaintiff was surprised at the announcement and disappointed that there had been no prior discussion among the school administration, the faculty and the student body regarding a consensus on this visitation. Plaintiff testified that he told the class "The majority of you may feel that there is nothing wrong with this at all, and that's perfectly all right for you to feel that way. On the other hand, there may be some among us who may feel rather strongly about it." Plaintiff indicated that before people like this are invited onto the campus there should be a consensus of the students and the faculty in favor of having them. Thereafter, general class discussion of the visit by military personnel ensued and continued during substantially all of the remaining class period. Four students testified that during this class period plaintiff became emotionally excited; one student testified that plaintiff "was upset in a surprised form, but . . . he didn't totally go to the end," indicating to the Court that plaintiff retained some control over his emotional state.
12a. David Palmer, a student in plaintiff's class present during this second *618 period of May 19, then sixteen years of age, testified that plaintiff mentioned to the class that the students at Hazelwood High School were "4000 strong," could get the military personnel off campus if they desired, and that "at Washington University they [the students] wouldn't tolerate it." Palmer testified, however, that plaintiff did not suggest that the students actually remove the recruiters physically.
b. On that day a student organization distributed apples to the faculty members to show appreciation. Four students, Douglas Stephens, Jim Shannon, Rickie Ferrier, and Timothy Watts testified that plaintiff suggested during that second period class that the students could throw his apple at the recruiters; they further testified that by his comments he implied that physical force could be used against the visitors.
c. Elizabeth Mueller, a student during the second period, testified that she did not remember if plaintiff advocated violence.
13. Also during this second period, after plaintiff made his remarks to the class, David Palmer prepared a petition to be circulated and signed. He had prepared various petitions before and he listened to the class discussion until he felt he could prepare a petition which students would sign. This petition had the following resolution: "We the undersigned request that all military persons be turned away from Hazelwood High campus." Palmer signed the petition and circulated it among the students in that class. Palmer testified, and the Court finds, that plaintiff knew nothing about the petition until near the end of the period when he presented it to plaintiff for his signature. Twelve students had signed it before plaintiff placed his signature on it. After the second period ended Palmer circulated the petition among other students in the hallway. Twenty-one signatures were placed upon it.
14. When the second period ended, students exited talking about the class discussion that had occurred. The third period began as usual and progressed for twenty minutes or so into the mathematics assignment before a student opened anew the discussion regarding the recruiters.
15. Plaintiff again commented that he did not feel that they had a right to be there because the student body as a whole had not been consulted. A general class discussion resulted in which at one point plaintiff said "In some segments of society this is an explosive issue, you know, and this is a public high school that's serving all kinds of people and so there are going to be some people in this community, you know, who are for it and there are going to be some who are against it . . . because of the fact that we have clamped down . . . and it seems to me somewhat unfair to bring in a controversial . . . people who might be controversial."
16. This military visitation was set up by Dale Henner, the assistant principal. At Henner's direction a literature display table was put in the school's front lobby adjacent to one of the school's two cafeterias and near the principal's office. The visitation was to last from 11:00 A.M. until 12:30 P.M.
17. Army Staff Sergeant Michael Smith had visited the school three or four times since 1968. With him on May 19 were Sergeant Bill Hall and Private First Class John Jondro. They were in Khaki uniform; they wore no weapons. Their purpose in being there was to provide information.
18. The three military personnel were standing together near the display table speaking with those who came up. During a recess period, when many students were in the hall, plaintiff approached Sergeant Smith. Plaintiff pointed his finger at Smith, without touching him, and said in a loud voice "On behalf of myself and other faculty members and the students, we don't want you here. We are getting together a petition to have a restraining order having you restrained from the school." Plaintiff's recollection of his statement to the officer was substantially the same. Smith *619 testified that he could not identify this person, but that there were students around the table within earshot. The speaker did not use heated words. Upon exiting the school the soldiers met with Henner and recounted the incident to him.
19. From comments made by plaintiff to other teachers in the teachers' lounge Henner determined that plaintiff was the one who had confronted the military visitors. Henner became concerned about this incident because the soldiers were to return the next day and he wished to avoid any further development or confrontation. Thus, Henner reported the incident to Principal Fuqua. Fuqua then recounted to Henner the March, 1971, incident. Henner directed that a note be placed in plaintiff's mail box requesting plaintiff to see him that day. Plaintiff did not respond.
20. That evening Principal Fuqua received a telephone call from Mr. Kenneth Watts, father of Timothy Watts, a student in plaintiff's second hour class. Mr. Watts voiced his objection to Fuqua about the classroom discussion and statements made by plaintiff. Following his conversation with Watts, Fuqua called Francis Huss, Hazelwood Co-ordinator of Secondary Education, who decided that plaintiff should be suspended until the matter was discussed with plaintiff.
21. The next day, May 20, as plaintiff arrived at his normal time he met Principal Fuqua and was directed to proceed to Fuqua's office. There plaintiff met with Fuqua, Henner, and Huss to discuss the hallway incident. Fuqua recounted to plaintiff the exchange between himself and plaintiff over the R.O.T.C. visit in March of 1971. Then the events of May 19, were discussed. The testimony of Huss, Henner and Fuqua indicates that plaintiff admitted, under questioning by Huss, that he had made the statement to his class to the effect that the student body was some 4000 strong and that at Washington University the presence of the military visitors would not be tolerated by the students. Plaintiff's testimony was that he denied making such an admission. From observing and weighing the oral testimony I resolve this conflict against plaintiff and find the credible evidence shows that plaintiff did make this admission to Huss. Plaintiff further admitted in his meeting that he had spoken to the soldiers in the hallway.
Huss suggested to plaintiff that he resign voluntarily because his dismissal would be recommended. At first plaintiff indicated his agreement to resign, but quickly changed his mind and rejected the idea of resigning.
Huss advised plaintiff that a report would be made and that he was suspended from his classroom duties until the matter was resolved. Then the meeting ended.
22. Huss immediately proceeded to the school district administration building and reported to Dr. Lawson, reviewing the situation with him. A written report was prepared for submission to Dr. Clarence McDonald, Superintendent of Education for the Hazelwood School District. While this written report was not offered into evidence a portion of it was read into the record as follows "Arbitrarily imposed his beliefs on current controversial political issue that regarding exposure to youth military career opportunities available." From the oral testimony I find that the bases for plaintiff's dismissal proffered at this time to Dr. McDonald were generally (a) inciting students to disruptive processes, and (b) interrupting the educational process. This report to Dr. McDonald related the substance of plaintiff's admissions to Huss as set out in Finding 21, above.
Dr. McDonald, after studying the matter concurred in the suspension pending action by the Board of Education that evening. Dr. McDonald instructed Huss to inform plaintiff that he was suspended from his teaching duties; that there would be a Board meeting that evening; and that plaintiff was invited to appear before the Board.
While Huss was making his report to the school district authorities plaintiff *620 had contacted an attorney for legal advice during these events.
23. Huss returned to the high school building and once again met with plaintiff and Fuqua. Plaintiff was advised of the Board meeting that night, that his dismissal would be recommended to the Board, that he was invited to attend and to speak on his own behalf. Plaintiff indicated that he would attend the Board meeting, probably with an attorney. However, later that day, plaintiff decided, upon the advice of legal counsel, not to attend the Board meeting. It was plaintiff's feeling that his presence would be to no avail in the face of the opposition he faced from the school administration.
24. That evening the Board met, as plaintiff had been advised. Plaintiff's name was called at the meeting but he did not answer. The Board considered, in closed session the report of Dr. McDonald who was present whose report was based upon the report made earlier by Huss. After a considerable amount of discussion the Board unanimously voted to terminate plaintiff's employment.
25. On May 21, 1971, plaintiff reported to the school to conduct his classes as usual. He was directed to report to Principal Fuqua who informed him that the Board had voted to terminate his employment immediately. Plaintiff's salary was terminated as of May 21, 1971.
26. Plaintiff was dismissed by the Hazelwood Board of Education prior to the expiration of the current 1970-1971 contract period. Neither a written notice nor a statement of the charges which were to be made against him at the Board meeting were ever provided to plaintiff.

CONCLUSIONS OF LAW

Count I
Plaintiff alleged in Count I that his employment as a Hazelwood High School teacher was terminated because he exercised his constitutionally protected right of free speech. At trial it became plaintiff's burden to prove this allegation. Rozman v. Elliott, 335 F.Supp. 1086, 1104 (D.Neb.1971), aff'd 467 F.2d 1145 (8th Cir. 1972). The only factual basis for the Board's termination of plaintiff's employment was the admissions made by the plaintiff (a) that he stated to his students that they were some 4000 strong and that the military visitors would not be tolerated by the Washington University students and (b) that he confronted the military personnel in the hallway. For the reasons stated below I hold that these were constitutionally permissible factual reasons for the Board's action.
The right of citizens to speak out on issues of the day is one of the strongest means available to citizens to ensure the proper conduct of government. The right to speak out, however, may properly be subjected to reasonable limitation or regulation. United States v. O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968); Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). Such limitation or regulation of a teacher's right to free speech, effected by dismissing him during the course of his contractual employment, must comport with the requirements of the Due Process clause of the Fourteenth Amendment to the United States Constitution. Ahern v. Board of Education of School District of Grand Island, 327 F.Supp. 1391, 1396 (D.Neb.1971), aff'd 456 F.2d 339 (8th Cir. 1972).
The First Amendment freedom "can be abridged by state officials if their protection of legitimate state interests necessitates an invasion of free speech." Burnside v. Byars, 363 F.2d 744, 748 (5th Cir. 1966). It is axiomatic that the proper education of its adolescent citizens is a legitimate interest of the State of Missouri. See Shelton v. Tucker, 364 U.S. 479, 485, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960). It becomes *621 incumbent upon the Court to decide whether the action of the Board of Education in dismissing plaintiff was a proper consequence of "the reasonable demands of a system of organized responsible learning." Pred v. Board of Public Instruction, 415 F.2d 851, 859 (5th Cir. 1969). In so doing the Court must strike "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering, supra.
Plaintiff was employed at the Hazelwood High School as a classroom teacher. As such he had a vital effect upon the successful operation of the school's educational processes by reason of his relationships with his students and with the school administration. Through him the policies of the school board and the principal were to be put into effect; his position was not that of a policy maker. He may have aspired to such a position but he was not free to so act at the expense of the proper working relationship between himself and the administration. See Jones v. Battles, 315 F.Supp. 601, 608 (D.Conn. 1970).
His statements referring to the high school student body as some 4000 strong and to the actions Washington University students would take were infused with the spirit of violent action. They were statements which took aim at the proper working relationship between the students and the administration, and at the proper relationship between himself and the administration. When considering the nature and quality of such statements the ages of the students to whom the statements were made may be taken into consideration. See Quarterman v. Byrd, 453 F.2d 54, 57 (4th Cir. 1971).
The statements made in class, considered in conjunction with plaintiff's action of confronting the soldiers in the hallway, bore the unmistakable appearance of having been designed to limit competition in the "marketplace of ideas" that is the school. Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675 (1967). This confrontation was an attempt to shoulder the mantle of policy maker and enforcer in clear opposition to the established policies of the school. Such action was not the silent action protected in Tinker, supra (wearing of black armbands by students), or in Hanover v. Northrup, 325 F.Supp. 170 (D.Conn.1970) (teachers refusal to lead class in the Pledge of Allegiance); it was not action taken away from the schoolhouse as was protected in Pickering, supra (teacher's publishing a letter in a local newspaper). Rather, this confrontation was an overt attempt to sabotage the visitation program by either disrupting the smooth operation of the program or by attempting to induce the military personnel to leave the school premises. Such interference by plaintiff with the operation of the school is not protected by the First Amendment to the United States Constitution from the action of the Board of Education in terminating his employment. See Glover v. Daniel, 318 F.Supp. 1070, 1075 (N.D.Ga.1969), aff'd 434 F.2d 617 (5th Cir. 1970); and see Rozman, supra at p. 7.
Plaintiff argues that no actual disruption occurred and there was no clear and present danger of such occurring as a result of the plaintiff's actions and, therefore, his actions are constitutionally protected. The Court disagrees. "A fair reading of Tinker [supra] . . . and Esteban v. Central Missouri State College, 415 F.2d 1077 (C.A.8th Cir. 1969), is persuasive for the proposition that potentially disruptive conduct is sufficient to remove the conduct from protected freedom of expression (emphasis added)." Rozman, supra 335 F.Supp. at 1097. See Norton v. Discipline Committee of East Tennessee State University, 419 F.2d 195, 199 (6th Cir. 1969) cert. den. 399 U.S. 906, 90 S.Ct. 2191, 26 L.Ed.2d 562; and Scoville v. Board of Education, 425 F.2d 10 (7th Cir. 1970), *622 cert. den. 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55. The experience of the high school administrators in dealing with the 4200 students and having experienced disruptions in the past was a sufficient basis upon which to forecast future disciplinary disruption by the plaintiff or the students. Furthermore, the Court considers plaintiff's actions, both in the classroom and in the hallway, disruptions of the orderly and disciplined operation of the school in and of themselves. Regarding the nature and duration of the classroom statements, the Court wholeheartedly subscribes to the proposition that a teacher has no constitutional right "to teach politics in a course in [algebra]." Ahern v. Board of Education of School District of Grand Island, 456 F.2d at 404 (8th Cir. 1972).

Count II
The termination of plaintiff's employment by the Board occurred before the expiration of his contract term and extinguished his ability to perform under the contract executed for the following school year. Clearly, plaintiff possessed a property interest in his continued employment which is encompassed within the protection of the Fourteenth Amendment. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 576-577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). However, this Court dismissed plaintiff's Count II claim which was based upon plaintiff's alleged failure to receive a pre-termination hearing. Court order filed November 30, 1971, pp. 7-8. In so dismissing the claim, the Court cited, inter alia, Freeman v. Gould Special School District, 405 F.2d 1153 (8th Cir. 1969) and Wilson v. Pleasant Hill School District R-III, 334 F.Supp. 1197 (W.D.Mo. 1971). Freeman and Wilson stand for the proposition that in the absence of a statute guaranteeing a teacher pre-termination procedural due process, failure of the state authority to afford such was not actionable under the civil rights statutes. Under the terms of the applicable Missouri statute, Section 168.126, RSMo 1969, V.A.M.S., the defendants were not required to provide a hearing as alleged in Count II.
After the Court's dismissal of Count II the United States Court of Appeals for the Eighth Circuit ruled in Cooley v. Board of Education of Forrest City School District, 453 F.2d 282 (8th Cir. 1972), that
as a matter of procedural Due Process the interest of a public school teacher in his continued employment until the natural expiration of the academic years is, in the absence of a countervailing state interest of paramount significance, sufficiently fundamental to prohibit his mid-term discharge without an explication of the reasons which underlie the termination and the opportunity meaningfully to be heard with regard thereto. at 286-287.
In Ahern the 8th Circuit Court of Appeals further developed the due process requirements when it said
in the absence of a countervailing state interest of overriding significance, a school teacher dismissed for cause during the course of a school year is entitled constitutionally to (1) notice of the reason for dismissal and (2) a reasonable opportunity for a hearing at which he or she is able to give testimony and to confront and question adverse witnesses. 456 F.2d at 402.
Plaintiff's two meetings with Huss, Fuqua and Henner on May 20 informed him of the objections they had to the events of May 19 in which he participated. The gravity of the situation after the first meeting prompted plaintiff to notify and seek the services of an attorney. At the second meeting with Huss, after Huss had returned from his meeting with Dr. McDonald, plaintiff was advised that a dismissal recommendation would be made, that the Board was to meet that evening and would consider the recommendation, and that he was invited to attend and speak on his own behalf. Plaintiff acknowledged the invitation and indicated that he would attend. The nature of the notice thus given was similar to the oral notice given in Ahern. *623 Ahern, 456 F.2d at 401-402. The Board met that evening, as plaintiff had been notified. The adequacy of the notice is underscored by the fact that plaintiff had already sought the advice of legal counsel and later conferred with him after the oral notice had been given and before the Board meeting was held. The required form that procedural due process is to take in any given case must be accommodated to the facts of each case. See Board of Regents v. Roth, 408 U.S. at 579, n. 8, 92 S.Ct. 2701 (1972). In Ahern the Court observed that the teacher
might have been notified with greater precision of the basis for her suspension and dismissal, and the time between the notice and the hearing might have been greater, and the school board might have detailed its decision in a formal writing, none of these ideal conditions are prerequisites to a finding that a hearing has been granted which comports with accepted notions of procedural due process. A fundamental requirement of due process is the opportunity to be heard, "at a meaningful time and in a meaningful manner" . . . . This opportunity must be "appropriate to the nature of the case" . . . . "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria & Restaurant Workers Union Local 473, A.F.L.-C.I.O. [v. McElroy], 367 U.S. 886, 895 [, 81 S.Ct. 1743, 6 L.Ed.2d 1230] . . . (1961).
* * * * * *
. . . She clearly understood that the basis for her suspension and her dismissal was insubordination by reason of her failure to comply with Dr. Miller's instructions regarding the restoration of order and proper curriculum in her classes. The superintendent of schools notified her in advance of the proposed board of education hearing. 456 F.2d at 403.
Under the circumstances of this case the failure of plaintiff to receive written charges in advance of the Board meeting did not violate the procedural due process to which he was entitled. See Austin v. Maxwell, 456 F.2d 1237, 1238 (5th Cir. 1972).
Regarding plaintiff's right to a meaningful hearing, plaintiff was entitled to the opportunity to be heard. Roth, supra, 408 U.S. at 579, n. 7, 92 S. Ct. 2701; see Perry v. Sindermann, 408 U.S. 593, 599, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Ahern, 453 F.2d at 403; and Gouge v. Joint School District No. 1, 310 F.Supp. 984, 992 (W.D.Wis.1970). Having been sufficiently notified of the hearing and after consultation with legal counsel, plaintiff decided in advance that he could receive no fair hearing because of the nature of the opposition from the school administration. The record is barren of any indication that plaintiff requested the Board to reconsider the termination or that such a request would have been meaningless. Further, the record is barren of any basis, other than plaintiff's preconceptions, that the Board meeting on May 20 would not have afforded plaintiff a meaningful hearing. At least at that time plaintiff might have requested that the Board continue the proceedings and reserve its decision until he had more time in which to prepare and present his case, if more time was necessary. Plaintiff's decision not to attend the Board meeting and his failure to request a subsequent hearing was a voluntary and knowing waiver of his right to a pre-termination hearing. See Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Upon reconsideration of the Court's previous dismissal of Count II, I now conclude in the light of subsequent cases that such dismissal was improper. However, the evidence adduced by plaintiff at trial clearly showed that he was not denied the opportunity for a hearing as required by the Due Process clause of the Fourteenth Amendment.

Count III
Count III of the complaint alleged that plaintiff was not afforded (a) a written *624 statement definitely setting forth reasons for his termination and (b) ninety days notice before termination, as required by Section 168.126, RSMo 1969, V.A.M.S., and therefore his dismissal was arbitrary. He further alleged that such failure "further compound [ed] and highlight[ed] his deprivation of his constitutional rights and due process as guaranteed under the Fourteenth Amendment of the Constitution of the United States." No allegation of jurisdiction, other than that incorporated from Count I and based upon 28 U.S.C. § 1343(3) and (4), is alleged in support of this count.
The issues thus presented are whether plaintiff has been deprived of due process as guaranteed by the federal constitution, and/or whether any failure to observe § 168.126 entitles plaintiff to state remedies. See Court's memorandum filed November 30, 1971, p. 10. The evidence adduced at trial clearly shows that plaintiff was not afforded the procedural steps set out in § 168.126(2). That section reads in pertinent part as follows:
If in the opinion of the board of education any probationary teacher has been doing unsatisfactory work, the board of education through its authorized administrative representative, shall provide the teacher with a written statement definitely setting forth his alleged incompetency and specifying the nature thereof, in order to furnish the teacher an opportunity to correct his fault and overcome his incompetency. If improvement satisfactory to the board of education has not been made within ninety days of the receipt of the notification, the board of education may terminate the employment of the probationary teacher immediately or at the end of the school year. (emphasis added).
Section 168.126(2) was enacted as § 168.113 of the Teacher Tenure Act. Therefore, this statutory section was a provision of plaintiff's employment contracts. See Finding of Fact No. 3, supra.

Federal issues
Plaintiff claims that his dismissal was an arbitrary exercise of the Board's authority. Due process has, indeed, been generally described in terms of freedom from arbitrary action. See Wiemann v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 97 L.Ed. 216 (1952). However, the Court has found that the Board's action was reasonable in that the grounds for the dismissal had a sound basis in fact (Finding No. 21, above), was related to the protection of a valid state interest, and was not impermissible under the First Amendment.
Procedural due process under the Fourteenth Amendment has been characterized as the right to fair and reasonable treatment under the circumstances. Olson v. Regents of University of Minnesota, 301 F.Supp. 1356, 1359 (D.Minn. 1969). It is grounded upon the proposition that, in a case such as this, plaintiff must be given sufficient notice of the charges against him and a sufficient opportunity for a proper hearing in which to refute the charges. Roth, 408 U.S. at 570-571, n. 8, and 573 n. 12, 92 S.Ct. 2701, 33 L.Ed.2d 548. The procedure set out in § 168.126(2) is remedial in nature. By its own terms it provides a probationary teacher an opportunity, not to refute or disprove a charge of incompetency or fault, but to purge himself to the board's satisfaction of the charges. Therefore, the rights afforded by this section are collateral to and independent of the procedural due process required by the Fourteenth Amendment. The termination of plaintiff's employment without the exercise of the § 168.126(2) procedure is not a violation of the procedural due process required by the Fourteenth Amendment.

State issues
The remaining claim is one for breach of the written employment contracts, actionable under the substantive law of Missouri, over which the Court must exercise pendent jurisdiction, if it is to decide the claim at all. The existence and *625 the exercise of pendent jurisdiction are matters to be treated separately.
Counts I and II involved claims, cognizable under federal law, which were sufficient as a basis for the subject matter jurisdiction of the Court pursuant to 28 U.S.C. § 1343. The instant state claim arose from the same nucleus of operative facts as did the federal claims. And it is inescapable that all three counts of the complaint are sufficiently interrelated to expect a plaintiff to try all of them in one action. The Court thus concludes that it has pendent jurisdiction over the state claim. See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
The parties to this action have not cited nor has the Court found any reported Missouri case construing the provisions of § 168.126(2) upon which plaintiff relies. Plaintiff cites Williams v. Longtown School District No. 71, 468 S. W.2d 673 (St. Louis C.A.1971), for his argument that the Board was without the authority to dismiss plaintiff unless the provisions of § 168.126(2) were applicable and were followed.
Plaintiff's Count III claim thus presents two issues, i. e. (a) was plaintiff dismissed for incompetency and, if not, (b) did the Board have implied authority to dismiss plaintiff for any other reason.
Defendants urge the Court to abstain from deciding these important state law issues. However, this case has been tried on its merits and the factors of judicial economy, convenience, and fairness to the litigants strongly militate in favor of the exercise of the Court's jurisdiction. See Gibbs, supra; e. g. Rosado v. Wyman, 397 U.S. 397, 404-405, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1969); Forest Laboratories, Inc. v. Pillsbury Company, 452 F.2d 621 (7th Cir. 1971); Gray v. International Association, 447 F.2d 1118, 1120 (6th Cir. 1971).
The difficulties in construing a new Missouri statute without the benefit of state case law on point is not a sufficient basis upon which to decline to exercise jurisdiction. Meredith v. City of Winterhaven, 320 U.S. 228, 234-235, 64 S.Ct. 7, 88 L.Ed. 9 (1943). Rather, this Court must interpret the statute as would a Missouri Court faced with the same issues. Ross v. Philip Morris & Co., 328 F.2d 3, 7 (8th Cir. 1964); Adams Dairy Company v. National Dairy Products Corporation, 293 F.Supp. 1135, 1145 (W.D.Mo.1968); Phelps v. Brookwalter, 210 F.Supp. 801, 804-805 (W.D. Mo.1962), aff'd 325 F.2d 186 (8 Cir.). It is incumbent upon the Court to construe the statutory section under consideration liberally by discerning the intent of the General Assembly, § 1.010, RSMo 1969, V.A.M.S., taking the words of the statute in their "plain or ordinary and usual sense." § 1.090, RSMo 1969, V.A.M.S. Donnelly Garment Co. v. Keitel, 354 Mo. 1138, 193 S.W.2d 577 (Mo.1946); State ex rel. Cooper v. Cloyd, 461 S.W.2d 833 (Mo.1971).

"Incompetency"
While "incompetency" is not defined in the statute explicitly, the scope of its intended definition may be discerned by comparing its usage in the several sections in which it is found. E. g. Consolidated School District No. 4, Greene County v. Day, 328 Mo. 1105, 43 S.W.2d 428 (1931).
Section 168.126(2) states that "[i]f in the opinion of the board of education any probationary teacher has been doing unsatisfactory work, the board of education . . . shall provide the teacher with a written statement definitely setting forth his alleged incompetency (emphasis added) . . . ." Thus, incompetency is directly related to unsatisfactory work. That such "work" is work that is performed in an effort to comply with one's duties as a teacher is readily discerned from the remedial nature of § 168.126(2), and the fact that incompetency is but one of several causes for the Board's termination of an indefinite teaching contract. § 168.114, RSMo 1969, V.A.M.S. The reasonable inference drawn from these uses of "incompetency" *626 is that this term refers, in § 168.126(2), to the ability of a probationary teacher to perform his professional teaching duties in a manner acceptable to the Board. The evidence adduced at trial showed that plaintiff was an average to above average teacher with an interest in his students. However, the statements made in the classroom on May 19 and the hallway confrontation with the military visitors on May 19, acts of plaintiff upon which the Board based its decision to dismiss him, were outside the scope of plaintiff's duties as an algebra teacher. Therefore, § 168.126(2) was inapplicable to the grounds for his dismissal.

"Implied Authority"
The second state issue, the existence of implied authority in the Board to dismiss plaintiff for a reason other than incompetency, I conclude for the reasons stated below, is not governed by the holding for which plaintiff cites Williams.
In McCutchen v. Windsor, 55 Mo. 149 (1874), directors of a school sub-district took possession of a schoolhouse and refused to allow the plaintiff, a properly qualified teacher under a written contract, to teach. The law in 1865 explicitly granted the directors "the duty . . . to dismiss any teacher at any time for such reason as they may deem sufficient; provided, such dismissal shall receive the sanction of the township board." McCutchen, supra at 151. Judge Wagner in McCutchen found, however, that the applicable law (enacted in 1870) had been modified in that the affirmative grant of the authority to dismiss was now missing. Instead, the relevant statute now read
It shall be the duty of the directors in each sub-district to manage and control its local interests and affairs. They shall have power to contract with and hire legally qualified teachers for and in the name of the sub-district, which contract shall be in writing . . . . Ibid. at 152.
Judge Wagner continued
The only power delegated to the directors in this section is to employ legally qualified teachers . . . If any power of dismissal exists, it is to be deduced by implication only.
* * * * * *
Manifestly then, before the directors had the right to dismiss the plaintiff in this case, it was incumbent on them to show a good cause and sufficient cause for their act. The evidence does not show that cause. Ibid at 152-153.
The judgment for the plaintiff was affirmed.
In Arnold v. School District, 78 Mo. 226 (1883), the issue again was the right of the directors "to terminate the plaintiff's contract . . . as a teacher." Arnold, supra at 229. The Court therein, commenting on McCutchen, acknowledged the implied authority of the board at the time of McCutchen to dismiss for good cause and found that such implication "rests upon the necessity of the case in the absence of any other method or remedy provided by the law to meet the possible abuses alluded to by [Judge Wagner] (emphasis added)." Ibid. at 231. However, the applicable law differed from that before Judge Wagner. Imported into the law in 1874 was the authority of the county commissioner to discharge teachers by revoking their certificates of license upon which their teaching qualifications were based. Ibid. at 232. The plaintiff in Arnold had been dismissed for inflicting corporal punishment on students in violation of the rules. The Court affirmed plaintiff's recovery of the wages called for under his contract reasoning thus:
The acts for which the plaintiff in this case was dismissed by the directors, were such as fall within the definition of "incompetency or immorality," for which the commissioner is expressly authorized by law to revoke his certificate and terminate his office and contract as a teacher under the school law. The directors are not possessed with this power. It has been expressly given to the commissioner and is no longer left to the directors by implication and necessity. If the acts of the plaintiff complained of to the directors *627 were sufficient in their judgment to justify his dismissal, they should have reported them to the commissioner, so that his office and position in the school and county as a teacher might be terminated according to law.
* * * * * *
The directors . . . assumed by notice to terminate his relation to them as a teacher, and they locked him out because of that supposed termination. As the power to do this was vested elsewhere under the law of 1874, it only remains for us to affirm the judgment . . . . Ibid. at 232-233.
The holding in Arnold was enacted by the legislature in 1889 thusly
The board shall have no power to dismiss a teacher; but should the teacher's certificate be revoked, said contract is thereby annulled. Laws, 1889, p. 224, § 7046a.
This provision was continued in effect in substantially the same form up to 1969. E. g. § 168.121, Laws, 1963. During the period from 1889 to 1969 the case law reflected the holding and rationale of Arnold. See e. g. Magenheim v. Board of Education, 347 S.W.2d 409, 414 (St. Louis C.A.1961); Williams v. School District of Springfield R-12, 447 S.W.2d 256, 261-262 (Mo.1969); Lynch v. Webb City School District No. 92, 373 S.W.2d 193, 197 (Springfield C.A.1963); Williams v. Longtown School District No. 71 of Perry County, supra, 468 S.W.2d at 675.
However, in 1969 § 168.121 was repealed, Laws 1969, § 1, p. 275, and the Teacher Tenure Act was enacted. That Act, regarding the termination by the Board of indefinite teaching contracts, provided that such contracts "may not be terminated by the board of education until after" certain procedures were followed. § 168.116(1), RSMo 1969, V.A. M.S. In comparison, regarding probationary teachers' contracts, § 168.126(2) provides that, if after the requisite written statement of alleged incompetency is served and no satisfactory improvement is made within ninety days, "the board of education may terminate the employment of the probationary teacher . . . ."
The reasoning in Arnold was based upon the fact that the legislature's affirmative grant of authority to commissioners to revoke certificates filled the void upon which the McCutchen finding of implied authority was premised. In Arnold no termination power resided in the directors by explicit enactment and the Court was unwilling to find an implied authority to terminate teachers. The grant of authority to the Boards by the Teacher Tenure Act to terminate permanent teaching contracts is very extensive. § 168.116, RSMo 1969, V.A. M.S. Yet teachers' certificates of license may still be revoked. § 168.071, RSMo 1969, V.A.M.S. Thus, the basis for the Arnold rationale for failing to recognize an implied authority in the Board to dismiss teachers does not now exist.
The 1969 enactment repealed § 168.121 which explicitly denied termination authority to the board and which reflected the holding in Arnold. In its place was enacted § 168.116(1), an explicit denial of authority to terminate the contracts of permanent teachers except according to certain procedures. Section 168.126(2) contains no such explicit denial of termination authority. Rather, the language is affirmative in nature ("the board of education may terminate") and relates to termination for incompetency. I conclude that this difference between §§ 168.116(1) and 168.126 (2) clearly indicates an intention in the Missouri General Assembly, by enacting the Teacher Tenure Act, to grant to the Board by implication the authority to dismiss plaintiff as it did.
To argue as plaintiff does that the Board can terminate a probationary teacher only for incompetency pursuant to § 168.126(2) is to argue that probationary teachers have a greater right to continued employment during the course of their contract term than do permanent teachers. I do not believe that to have been the legislative intent of the Missouri *628 legislature. Mo.Atty.Gen.Op. No. 18, supra at 3.
The existence of this implied authority to dismiss probationary teachers for reasons other than incompetency is further indicated by the fact that at its enactment on August 21, 1969, § 168.126(2) comported with the then understood requirements of federal procedural due process. See Freeman, supra; and see the order of this Court filed November 30, 1971. I therefore conclude that the Board did not dismiss plaintiff in violation of any statutory or contractual provision.
In consequence I find no merit in any claim of the plaintiff. Judgment will be for the defendants.